**ENGEL SHEET METAL EQUIPMENT, Inc., a Corporation (Plaintiff), Appellant,**

**v.**

**Gordon H. SHEWMAN, Robert Burns and Sam D'Agostino (Defendants), Respondents.**

**No. 29728.**

St. Louis Court of Appeals.

Missouri.

Dec. 3, 1957.

Benjamin B. Tepper, St. Louis, for appellant.

Kingsland, Rogers & Ezell, Clayton, for respondents Shewman and Burns.

WOLFE, Commissioner.

The Engel Sheet Metal Equipment, Inc., sought an order adjudging the respondents

in contempt of court for alleged violations of an injunction. The court, after a hearing upon an order to show cause, found in favor of all alleged contemnors and discharged them. The Engel Sheet Metal Equipment, Inc., appealed.

Some time prior to the occurrences here considered the Engel Sheet Metal Equipment, Inc. brought an action in the circuit court against Gordon H. Shewman and Robert Burns, who are two of the respondents here, and certain other parties. The purpose of that suit was to enjoin the defendants from the manufacture of a sheet metal cutting device known as the "Metal Miracle". The defendants were charged with engaging in unfair competition with the plaintiff corporation which manufactured a similar machine called "Duct Master".

The case was tried in Division No. 2 of the Circuit Court of the City of St. Louis and Judge Aronson, who was then presiding, entered a decree on September 21, 1955, which enjoined Shewman and Burns and any person acting in their behalf "(A) From manufacturing 'Metal Miracle' machine or tool, or a similar machine or tool, or any of the parts thereof. (B) From selling 'Metal Miracle' machines or tool, or any parts thereof, or similar machines and tools, on their own behalf, or in behalf of any other person engaged in the business of manufacturing and selling machines and tools to the sheet metal industry."

In addition to the injunction an accounting was ordered and from the final decree an appeal was taken to the Supreme Court.

On March 6, 1956, the Engel Company filed its petition for an order to show cause why Shewman and Burns should not be held in contempt for violating the injunction. It alleged that the defendants continued after September 21, 1955, to manufacture and sell the "Metal Miracle".

In their return to the order to show cause the defendants alleged that after the injunction against them they appealed and were attempting to secure a supersedeas bond. They admitted that on November 15, 1955, one of their salesmen took a deposit of $200 on one of the machines, but they denied that it constituted a sale. They further alleged that they had sold their business to a party by the name of Sam D'Agostino and stated that if there were any sales made thereafter such sales were by D'Agostino and not by them.

There was a hearing on the order to show cause on March 22, 1956, before Judge Mayfield, who was then presiding over Division No. 2, and on March 29, 1956, the court denied the citation for contempt but retained jurisdiction to hear further evidence "supplemental to or accumulative" of the evidence introduced at the hearing.

On June 7, 1956, an amended petition for an order to show cause was filed. It sought a citation against the same defendants and also against D'Agostino to whom the defendants had sold their business.

At the second hearing a transcript of the testimony given at the first hearing was put in evidence and this together with additional testimony made up the case upon which the court found for the alleged contemnors.

■ The facts of the matter are that after the injunction of September 21, 1955, some of the machines were being manufactured for Shewman and Burns by the Clarkson Manufacturing Company of Nashville, Illinois. The president of the appellant corporation testified that he visited the Clarkson Manufacturing Company on December 7, 1955, and saw there nine machines which were in the final stages of manufacture and one completed machine that belonged to Shewman and Burns.

On December 1, 1955, Shewman and Burns sold their business known as the Metal Miracle Products Manufacturing Company to Sam D'Agostino. The contract of sale recites that they desired to sell because they had been enjoined by the circuit court from manufacturing and selling

"certain products heretofore made and sold by them". The contract provided that D'Agostino would pay them $7,448.52 for their assets which were listed in an inventory and consisted of various items, such as jigs, tools, dies, etc. There was also a provision that Shewman and Burns had a right to buy back a half interest in the business if the decree by which they were then enjoined was reversed on appeal.

On January 28, 1956, Shewman and Burns transferred to the Clarkson Manufacturing Company the "Metal Miracle" machines with the right to sell or dispose of them as they saw fit.

Sam D'Agostino was employed by a company that had been making some parts for the "Metal Miracle". He knew of the injunction when he entered into the agreement to purchase the business of Shewman and Burns. He took over their place of business and started making the machines there. There was an admission by counsel for D'Agostino that he was still making the machines at the time of the second hearing. Men who worked for him testified that they were engaged in manufacturing the "Metal Miracle", and that Burns had showed them how to make adjustments on the machines in 1956.

At the time of the injunction Shewman and Burns had a salesman working for them. This salesman sold two machines after the injunction, one on November 1, 1955, and the other on November 15, 1955. When they sold their business the orders obtained by the salesman were turned over to D'Agostino by Shewman and Burns, together with some orders that had been taken prior to the date of the injunction. These orders were assigned by D'Agostino to the Clarkson Manufacturing Company in February, 1956. The machines were delivered to the purchasers and after their delivery the Clarkson Company collected on assigned invoices the retail sale price of the machines. Following this arrangement the Clarkson Company shipped five machines in 1956 and mailed to Sam D'Agostino checks for the difference between the sale price and the manufacturing price. The first check that D'Agostino received from the Clarkson Company was for $747.30. He endorsed this check over to Shewman and Burns.

In addition to the two sales made after the injunction Burns ordered a set of cutting wheels manufactured by the Clarkson Manufacturing Company on October 13, 1955.

■ The respondents failed to file briefs in support of the court's decree but from remarks of the court and of counsel appearing in the transcript of record, it seems that the court was of the opinion that since D'Agostino was not a party to the original suit resulting in the injunction he could not be held in contempt. The statute relating to the punishment for violating an injunction is Section 526.220 RSMo 1949, V.A.M.S. It is true that it provides punishment of a person for the violation of an injunction if disobeyed "after it is served on him" but this has been held to be no bar to punishing one who violates an injunction with full knowledge of it even though he has not been served. In re Coggshall, 100 Mo.App. 585, 75 S.W. 183. This is true even though the violator was not a party to the original action. Ex parte Dillon, Mo.App., 96 S.W.2d 1095. Consequently, one who, with notice, participates in acts in violation of an injunction is guilty of contempt and the fact that he was not a party to the action, or actually served with a copy of the injunction, will not relieve him. Middleton v. Tozer, Mo.App., 259 S.W.2d 80.

■ Upon review of a case in equity the appellate courts defer to the findings of the chancellor where there is conflicting verbal testimony and a determination of the issues rests upon the credibility of witnesses. However, where it appears that the findings of the chancellor are erroneous, the appellate court must make its own findings. Dreckshage v. Dreckshage, 352 Mo.

78, 176 S.W.2d 7; Potashnick Truck Service v. City of Sikeston, 351 Mo. 505, 173 S.W.2d 96; Fried v. Schiff, Mo.App., 181 S.W.2d 776. In the matter before us there was really no conflicting evidence to consider. Neither Shewman nor Burns denied that they had made sales after the injunction through their salesman. They also ordered the manufacture of cutting wheels and assisted D'Agostino by instructing his workmen how to adjust the machines that D'Agostino was making.

 The injunction prohibited the manufacture or sale of the machine or any of its parts. All of the mentioned acts of the three defendants were in violation of the injunction for they consisted of both the sale and manufacture of the machine. The means used to enforce a judgment or decree for the benefit of a party litigant is to cite the party who is in violation of the court's decree for civil contempt. The defendants here having violated the injunction, the court should have held them in contempt and assessed penalties against them, for no subterfuge or device used to avoid the force and effect of a decree can exonerate those employing it. Hobbs v. Poteet, 357 Mo. 152, 207 S.W.2d 501; State, on Inf. of McKittrick v. Koon, 356 Mo. 284, 201 S.W.2d 446.

For the reasons stated, the judgment should be reversed and the cause remanded to the circuit court with directions to enter a new judgment holding the defendants in contempt and assessing such punishment as to that court may seem proper.

PER CURIAM.

The foregoing opinion of WOLFE, C., is adopted as the opinion of the court.

The judgment is accordingly reversed and the cause remanded to the circuit court with directions as recommended by the Commissioner.

RUDDY, P. J., and MATTHES and ANDERSON, JJ., concur.