Howard MECHANIC, Joel Achtenberg, Margaret Murphy, Michael Ryan, William Bothwell, Dennis Winkler and Lawrence Kogan, Petitioners,

v.

Robert GRUENSFELDER, Director of Correctional Institution, Respondent.

No. 33891.

St. Louis Court of Appeals, Missouri.

Dec. 4, 1970.

Joseph Cohn, E. St. Louis, for Dennis Winkler, Lawrence Kogan and Margaret Murphy.

Irving Achtenberg, Kansas City, for Joel Achtenberg.

Francis L. Ruppert, Clayton, for William Bothwell and Michael Ryan.

Louis Gilden, St. Louis, for Howard Mechanic.

Joseph B. Moore, County Counselor, Andrew Minardi, Associate County Counselor, Clayton, Bryan, Cave, McPheeters & Mc-Roberts, C. Perry Bascom, William R. Bascom, St. Louis, for respondent.

PER CURIAM.

In this habeas corpus proceeding petitioners seek review of their convictions for contempt of court for violation of a temporary restraining order issued by the Circuit Court of St. Louis County. In their application for writ and their answer to the return of the warden of the county jail certain contentions were advanced which have not been carried forward to their brief filed in this Court. In view of counsels' assertions at various court appearances that the brief would set forth all contentions seriously urged we treat only of the matters briefed and consider other contentions abandoned.

On March 24, 1970, Washington University filed its petition for injunction against seven individuals "individually and as representatives of an unnamed class of persons whose identities are unknown but who are participating in the acts referred to [t]herein." Petitioner Mechanic was one of the seven. The entire class was referred to as "defendants." The petition stated that on March 23, 1970, the named defendants and other defendants, numbering some 250, invaded certain premises belonging to plaintiff, namely South Brookings Hall and the Army Air Force Reserve Officers Training Corps facilities [hereinafter R.O.T.C.] without permission, and engaged in conduct which, stripped of its legal verbiage, constituted a riot. This conduct and its threatened continuation hampered and interfered with the conduct of the University's business, damaged and threatened damage to its property and that of others by which the University would be irreparably injured and for which it had no adequate remedy at law. The University prayed for issuance of a temporary restraining order, a temporary injunction and a permanent injunction against "all defendants (including all others who are members of the class aiding, abetting and assisting

those defendants specifically named herein and all other individuals who may gain actual knowledge of such order) and each of them" from a broad range of activities which would interfere with the operation of the University, the activities of other persons using the University facilities, or would damage the property of the University or of others within or about the University premises.

On the same day, *ex parte,* the Court issued its temporary restraining order and order to show cause which is set forth in the margin.[1] Bond as called for in the Order was filed and upon application of the named defendants was ordered increased on two occasions, which was done. Additional parties, including petitioner Kogan, were added by motion. Of the seven petitioners before us, two—Kogan and Mechanic—were named parties to the original suit as amended and five were not named parties.

On the night of May 4, and the early morning of May 5, 1970, while the restraining order was in full effect, there occurred on the Washington University Campus the events giving rise to the contempt convictions now before us. At approximately 10:30 P.M. a "rally" began at the quadrangle, at which a large number of individuals gathered. Speeches were made, and the crowd left the quadrangle area and marched through the dormitory area of the campus to the R.O.T.C. facilities arriving there at approximately 11:45 P.M. The

---

1. TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

"This matter having come for hearing on the plaintiff's verified petition and motion and the Court having read the petition and motion and having heard the statement of counsel and being fully advised in the premises finds that plaintiff's petition states a claim for relief and that there will be irreparable damage unless this Order is issued.

"NOW THEREFORE, it is ordered, adjudged and decreed that defendants, and all persons acting in conjunction with them or on their behalf, and all others who are members of the class aiding, abetting and assisting those defendants specifically named herein and all other individuals who may gain actual knowledge of this Order, be and hereby are restrained and enjoined from:

"1. Engaging in assaulting others against the peace or to the terror or disturbance of others on or about plaintiff's property in St. Louis County, Missouri.

"2. Physically hindering, obstructing, interfering with, delaying, molesting or harassing other persons desiring to enter upon or to pass through or to go about plaintiff's property in St. Louis County, Missouri, for the purpose of conducting their business or for any other purpose.

"3. Unauthorized entering or occupying the inside of any buildings or edifices of plaintiff in St. Louis County, Missouri, or engaging therein, thereat or thereabout in any acts or conduct of whatsoever character which interferes with, intimidates, harasses or hinders plaintiff's employees or any other members of the University community, or the public at large having usual and customary access to plaintiff's property in St. Louis County, Missouri, or which in any way interferes with or hinders the proper and normal conduct of plaintiff's operations, or of others who are members of the University community.

"4. Molesting, converting, abusing or otherwise physically disturbing any personal or real property of plaintiff or under the care, custody or control of plaintiff or within or about plaintiff's premises in St. Louis County, Missouri.

"This Order shall be effective as to all persons and bound thereby from and after receipt of it through service or otherwise and shall remain in effect until the further Order of the Court.

"It is further ordered that plaintiff give bond to be approved by the Court in the amount of $1,000, conditioned that all damages and costs of defendants be paid in the event the foregoing Order be dissolved without the issuance of a temporary injunction thereon.

"It is further ordered that defendants on the 9th day of April 1970, appear in Division No. 1 of the Circuit Court of the County of St. Louis, Missouri, sitting at Clayton, Missouri at 9:30 A.M., and then and there show cause, if any there be, why a temporary injunction should not be issued covering the matters in this restraining order described.

"Dated at Clayton, Missouri, this 24th day of March, 1970.

(signed) George E. Schaaf, Judge"

crowd at those facilities was large, estimated by various witnesses as 600 to 2000 persons.

Much shouting occurred, volleys of rocks were thrown at the R.O.T.C. facility breaking windows and otherwise damaging the building, the door was ripped off the building, the interior furniture and papers were strewn about and damaged, the building was set on fire, firemen attempting to fight the blaze were driven off by volleys of rocks and firecrackers, policemen and security guards of the University attempting to control the crowd and protect the building were subjected to additional volleys of rocks and firecrackers. The building was extensively damaged. Although euphemistically referred to as a "demonstration" by some of the witnesses, the activities of the night constituted a riot.

On May 5, plaintiff filed in the Circuit Court its "Motion for Issuance of Attachment for Contempt Pursuant to Rules 92.15 and 35.01 Revised Statutes of Missouri 1959" against petitioners.[2]

The motion set forth the specific acts of each petitioner claimed to be in violation of the restraining order, alleged actual knowledge of the order by each petitioner, and prayed that the petitioners be brought before the Court to show cause why they should not be held in contempt and punished accordingly. On the same day the Court issued its attachment for contempt and order to show cause and its writ of attachment to the sheriff of St. Louis County. Petitioners do not dispute that they received a copy of the motion for issuance of attachment and the writ of attachment.

Trial of petitioners for contempt began on May 25, 1970, and concluded on June

11, 1970. The Court filed its findings of fact, conclusions of law, decree, judgment and order of commitment as to each petitioner. The findings of fact were made "both on a preponderance of the evidence and beyond a reasonable doubt." As to each petitioner the Court found the specific act or acts constituting the contempt and made a finding that each petitioner had actual knowledge of the restraining order. Each petitioner was found guilty of criminal and civil contempt and sentenced to the county jail for periods ranging from three months to six months for the criminal contempt. Fines for criminal contempt were also imposed. Shorter jail sentences were imposed for the civil contempt subject to purging, which sentences run concurrently with the criminal sentences.[3]

■ Some of the points raised by petitioners in this proceeding require a discussion of the basic concept of contempt of court. Contempts fall into two categories, civil and criminal. Although at times the line is hard to draw, the essential difference lies in who is sought to be protected by the contempt proceeding. Civil contempt is for the protection of a party to the litigation, the party for whose benefit the order, judgment or decree was entered. Its function is to provide a coercive means to compel the other party to the litigation to comply with relief granted to his adversary. The civil contemnor has at all times the power to terminate his punishment by compliance with the order of the court—i.e.: purging. Gompers v. Bucks Stove and Range Co., 221 U.S. 418, l.c. 441 et seq., 31 S.Ct. 492, 55 L.Ed. 797.

■ Criminal contempt on the other hand does not serve the function of aiding

---

2. The Motion also named one other individual, but her name was stricken on May 6.

3. The punishment for each petitioner was:

| Name | Criminal | Civil |
|---|---|---|
| Lawrence Kogan | 6 months and $500 | 30 days |
| Howard Mechanic | 6 months and $500 | 30 days |
| Margaret Murphy | 4 months and $150 | 20 days |
| William Bothwell | 4 months and $250 | 15 days |
| Michael Ryan | 3 months and $150 | 10 days |
| Dennis Winkler | 3 months and $150 | 10 days |
| Joel Achtenberg | 3 months and $150 | 10 days |

a litigant in achieving the relief granted but is for the purpose of protecting the dignity of the court and, more important, to protect the authority of its decrees. The thrust of criminal contempt is the intentional interference with the judicial process and the demonstrated refusal to be bound by judicial determinations. Gompers v. Bucks Stove and Range Co., *supra*, In re Reese, 10 Cir., 107 F. 942. The power of criminal contempt springs not from the needs to protect a litigant, but from the inherent power of the courts to protect the judicial system established by the people as the method for solving disputes. Without this power courts are no more than advisory bodies to be heeded or not at the whim of the individual.

With this in mind we turn to the contention of petitioners Winkler, Murphy, Ryan, Bothwell and Achtenberg, that their convictions for contempt are fatally defective because: "(1) They were not parties bound by the proceedings (2) they were not properly within any purported class as required by law (3) there was no proof, as so found by the trial court, of any concerted activity by them in aid of other defendants."

We are cited by petitioners to Alemite Mfg. Corporation v. Staff, 2 Cir., 42 F.2d 832, an opinion by Judge Learned Hand, holding that a third party to a patent infringement suit could not be punished for contempt.

Alemite involved a civil contempt case in which the winning litigant was attempting to extend the protections of its decree to third parties against whom no relief had been granted. To the extent the case discusses the law in civil contempt cases it is persuasive; to the extent it purports to address itself to criminal contempt it is *dicta*.

■ The convictions here were for both criminal and civil contempt. Where both forms of contempt are present the proceeding takes on the cloak of the criminal proceeding and is governed by the rules pertaining to it. United States v. United Mine Workers of America, 330 U.S. 258, l.c. 300, 67 S.Ct. 677, 91 L.Ed. 884; Union Tool Co. v. Wilson, 259 U.S. 107, l.c. 110, 42 S.Ct. 427, 66 L.Ed. 848. We are unable, however, to find any elements of civil contempt in the punishment imposed in this proceeding. The relief sought by plaintiff in its original petition was restraint of activities which would interfere with the conduct of University operations, cause the destruction of University property, and allow the harassment of employees, students and the public on the University property. That was the nature of the restraints contained in the temporary restraining order. In determining the character of the proceeding we are guided by the test set forth in Gompers v. Bucks Stove and Range Co., *supra*:

"The distinction between refusing to do an act commanded,—remedied by imprisonment until the party performs the required act; and doing an act forbidden, —punished by imprisonment for a definite term; is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment." (221 U.S. l.c. 443, 31 S.Ct. at 499).

■ The contempt charged here and found by the trial court was the doing of acts forbidden by the restraining order. The conduct of May 4 and 5, completely thwarted the restraints imposed and the protection desired. Contempt proceedings could not restore the building, recall the rocks and firecrackers thrown or unbreak the windows. No enforcement of the order for the benefit of the University could be accomplished by civil contempt proceedings resulting in imprisonment nor could the petitioners purge their completed contempt. In such posture the imposition of jail sentences for civil contempt was improper as to all petitioners. Gompers v. Bucks Stove and Range Co., *supra*, l.c. 449, 31 S.Ct. 492; Curtis v. Tozer, Mo.App., 374 S.W.2d 557 [12, 13].

Before turning to the above set-out contentions of petitioners as they pertain to criminal contempt it would be well to examine Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210, affirming contempt convictions upheld by the Alabama Supreme Court, 279 Ala. 53, 181 So.2d 493. The *Walker* case bears striking similarity to the cases now before us. The City brought its bill of complaint seeking injunctive relief against 139 individuals and two organizations who were alleged to have sponsored, participated in, conspired to commit and encouraged "sit-in" and "kneel-in" demonstrations, mass street parades, trespasses on private property, congregating in mobs in public places, and unlawful picketing. These actions were expected to continue. The Circuit Court issued, *ex parte,* its restraining order prohibiting a wide range of conduct by respondents and others including "all persons having notice of such order." [4]

Two days after the issuance of the Order a street parade was held in which the contemnors participated. The parade was unlawful in that a permit had not been obtained from the City. Certain of the contemnors were not parties to the suit brought by the City but did have actual knowledge of the restraining order. The Alabama Supreme Court in upholding the convictions of non-party contemnors stated: "The general rule is that one who violates an injunction is guilty of contempt, although he is not a party to the injunction suit, if he has notice or knowledge of the injunction order, and is *within the class of persons whose conduct is intended to be restrained,* or acts in concert with such a person." Walker v. City of Birmingham, 279 Ala. 53, 181 So.2d 493, l.c. 503, (emphasis supplied).

Although not discussing the above language, the United States Supreme Court did affirm the convictions of all contemnors, thus recognizing that being a party to the suit is not a requirement for a criminal contempt conviction.

The Supreme Court upheld the convictions in the face of its substantial doubts of the constitutional validity of either the restraining order or the underlying parade permit ordinance. Both were considered by the Court to be overly general and vague. Nevertheless, the Court applied the rule of law that an injunction issuing out of a court of general jurisdiction, with equity powers, upon pleadings properly invoking its action must be obeyed however erroneous the action of the court may be. Until the decision is reversed either by the court itself or by a higher court, the orders of the court are to be respected and their

---

4. The pertinent portion of that order read as follows: " ' * * * that the respondents and the others identified in said Bill of Complaint, their agents, members, employees, servants, followers, attorneys, successors and all other persons in active concert or participation with the respondents and all persons having notice of said order from continuing any act hereinabove designated particularly: engaging in, sponsoring, inciting or encouraging mass street parades or mass processions or like demonstrations without a permit, trespass on private property after being warned to leave the premises by the owner or person in possession of said private property, congregating on the street or public places into mobs, and unlawfully picketing business establishments or public buildings in the City of Birmingham, Jefferson County, State of Alabama or performing acts calculated to cause breaches of the peace in the City of Birmingham, Jefferson County, in the State of Alabama or from conspiring to engage in unlawful street parades, unlawful processions, unlawful demonstrations, unlawful boycotts, unlawful trespasses, and unlawful picketing or other like unlawful conduct or from violating the ordinances of the City of Birmingham and the Statutes of the State of Alabama or from doing any acts designed to consummate conspiracies to engage in said unlawful acts of parading, demonstrating, boycotting, trespassing and picketing or other unlawful acts, or from engaging in acts and conduct customarily known as "kneel-ins" in churches in violation of the wishes and desires of said churches.' "

disobedience is contempt of the lawful authority of the court.

■ The court below had jurisdiction of the subject matter and equity powers, and issued its order on pleadings properly invoking its action. The contention of these five petitioners is, essentially, that they were not bound by the injunction and therefore could not be in contempt of it. We think this overlooks the essential difference between being bound by a court order (the essence of civil contempt) and deliberately interfering with the processes of a court (the essence of criminal contempt). Ex parte Clark, 208 Mo. 121, 106 S.W. 990. Criminal contempt is punishable because it constitutes an interference with the judicial system. If it occurs in the presence of the court it may be summarily punished; if it occurs outside the presence of the court it may be punished only after notice and hearing. Rule 35.01, V.A.M.R. This difference in procedure is based upon the availability of facts to the judge who must make the determination of contempt. Ex parte Clark, *supra*. But we do not understand that this difference in procedure also creates a difference in who may be found in contempt. Whether occurring within the presence of the court or without, it is the interference with the judicial system which is being punished. Certainly no argument can be advanced that a spectator in a courtroom who disrupts trial proceedings could escape punishment for contempt simply because he was a stranger to the litigation. Nor can one who deliberately and knowingly interferes with an order of the court which seeks to preserve the property of the plaintiff during the pendency of the litigation escape punishment for such interference simply because he is not a party to the litigation.

■ The restraining order was sought by plaintiff to prevent a repetition on its campus of disruptive activities causing damage to its property and interfering with the operation of the University. Such activities had already occurred and were threatened for the future. The participants were numerous, varying and hard to identify in full. They were not an organization or other readily identifiable group. Plaintiff's petition made clear that it sought the injunctive relief in order to terminate the disruptive riotous actions of a substantial group on its campus. The restraining order as entered sought also to meet this problem. Whether the restraints imposed were greater than necessary to cope with the problem or whether the order restrained activity not intended we need not decide. Its thrust was directed to all who might engage in riotous activity against the University property, employees, students or persons properly on the campus. It was intended to prevent exactly the conduct engaged in on May 4 and 5. As such, the persons whose conduct was intended to be restrained were those persons participating in riotous activities against University property, employees, students or persons properly on the campus. Any person so engaging was a member of the class intended to be restrained and if such person had knowledge of the order his conduct in violation of it was contemptuous.

We do not conclude as petitioners do, that the class intended to be restrained must be a definable identifiable group of individuals who would under the class action rules be bound as parties if their representatives in the litigation had judgment rendered against them. We will not explore, and need not explore, the degree to which an amorphous group such as this could be individually bound *as a party* by a class action suit such as this. It is enough to say that participation in the activities of May 4 and 5 by persons having actual knowledge of the restraining order was an interference with the order of the court and was contemptuous. Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210; Walker v. City of Birmingham, 279 Ala. 53, 181 So.2d 493; In re Lennon, 166 U.S. 548, 17 S.Ct. 658, 41 L.Ed. 1110; Chisolm v. Caines, C.C., 121

F. 397; In re Reese, 10 Cir., 107 F. 942; In re Coggshall, 100 Mo.App. 585, 75 S.W. 183; Middleton v. Tozer, Mo.App., 259 S.W.2d 80; Engel Sheet Metal Equipment Inc. v. Shewman, Mo.App., 307 S.W.2d 694.

What we have heretofore said in regard to Walker v. City of Birmingham, *supra,* disposes of petitioners' contention that the temporary restraining order was void for vagueness. It was certainly clear enough that the conduct occurring on May 4 and 5 was prohibited by the restraining order. If portions of the order were too vague the way to attack those portions was through the judicial processes, not through willful disobedience of the clear restraints imposed. Walker v. City of Birmingham, *supra*; Howat v. Kansas, 258 U.S. 181, 42 S.Ct. 277, 66 L.Ed. 550.

Those petitioners not named parties to the original suit claim they lacked any way of attacking the order through judicial channels. We cannot conclude that such fact, even if true, would authorize deliberate violation of the order, and we do not believe *Walker, supra,* so holds. But if petitioners believed their rights were being infringed by the temporary restraining order they were free to attempt intervention to seek modification of the order or to have it set aside. Rule 52.11, V.A.M.R.

Petitioners' contention that no adequate reason was shown for excusing a hearing prior to issuance of the restraining order and therefore no contempt can be adjudged is a collateral attack on the order and without merit. The order was a valid and subsisting order of a court having jurisdiction and was to be obeyed. Temporary restraining orders may be issued without notice or hearing. Bayer v. Associated Underwriters, Inc., Mo.App., 402 S.W.2d 11 [1, 2]. The circumstances of the issuance of the order might be pertinent in a proceeding to set it aside or modify it, but has no place in a contempt proceeding.

The restraining order did not become non-existent because no hearing on

the request for temporary injunction was held prior to May 4. It is true that a temporary restraining order is just that—temporary—and that hearing on more permanent relief at which both sides have an opportunity to be heard should be held expeditiously. But no undue delay appears here. The hearing on the temporary injunction was continued on several occasions either to enable the Court to pass on various pre-hearing motions or to add parties and obtain service on them. This does not invalidate the temporary restraining order. United States v. United Mine Workers of America, 330 U.S. 258, 1.c. 301, 67 S.Ct. 677, 91 L.Ed. 884.

The contention that the bond was defective and the restraining order was therefore void is also without merit. In Curtis v. Tozer, Mo.App., 374 S.W.2d 557 [30], we held that the provisions of the statute requiring a bond are read into the bond. The bond in this case named as obligees the defendants named in the petition and that is all that Rule 92.09, V.A.M.R. requires. Upon the filing of the bond in compliance with the rule the temporary restraining order became effective. Petitioners' objection to the bond is that it did not name them, either individually or as a group, as obligees. First of all, we do not believe the rule requires the plaintiff or the court to anticipate every person who might disobey the court's order and include them in the bond. Curtis v. Tozer, Mo. App., 374 S.W.2d 557 [28]. Secondly, the petition described "defendants" in broad language sufficient to include anyone with knowledge of any subsequent court order and the bond ran to "defendants." And as we held in Curtis v. Tozer, *supra,* " * * * if it was a mandatory requirement of the statute that the bond run to interested parties, the court may read into the bond that provision of the statute." [30].

Ex parte Dillon, Mo.App., 96 S.W.2d 1095, relied on by petitioners was a civil contempt case. We can see some justification for the holding there that if the

persons are bound by the injunction they should be named as obligees, either individually or by descriptive appellation. We do not, however, understand the requirement of a bond to be to protect people who deliberately and willfully interfere with the court processes. It is instead to protect parties who sustain damage as a result of compliance with a temporary restraining order later determined to have been illegally or improperly issued. Furthermore, to the extent Curtis v. Tozer and Ex parte Dillon, *supra*, are in conflict, the action of the Supreme Court in adopting our opinion in *Curtis* would seem to reconcile the conflict in favor of the *Curtis* decision. Missouri Supreme Court Cause No. 50596, In re Curtis, January 31, 1964 (not reported); In re Curtis' petition, D.C., 240 F.Supp. 475.

Petitioners also attack the motion for attachment and the attachment itself as insufficient to comply with Rule 35.01(b).[5]

Procedural due process in a criminal contempt proceeding "requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation." In re Oliver, 333 U.S. 257, l.c. 275, 68 S.Ct. 499, 92 L.Ed. 682; In re Green, 369 U.S. 689; Curtis v. Tozer, *supra*, [38–40]. Rule 35.01(b) provides that criminal contempt shall be prosecuted on notice which may be oral by the judge in open court or by order to show cause or by order of arrest. The notice shall state the essential facts constituting the contempt and must describe it as criminal. It must state a time and place for hearing, allowing a reasonable time for preparation of the defense. The rule is nearly identical with Federal Criminal

Rule 42(b). A proceeding for criminal contempt is sui generis, and as such is controlled by its own rules—not the rules of the criminal law. Osborne v. Purdome, Mo., 244 S.W.2d 1005; Osborne v. Purdome, Mo., 250 S.W.2d 159; Curtis v. Tozer, Mo.App., 374 S.W.2d 557 [9, 10]. It is unnecessary that the notice meet the specificity and technical requirements of an information or indictment, so long as it sufficiently advises the alleged contemnor of the actions which it is claimed constitute contempt. United States v. United Mine Workers of America, 330 U.S. 258, l.c. 296, 67 S.Ct. 677, 91 L.Ed. 884; Osborne v. Purdome, Mo., 244 S.W.2d 1005. It is also unnecessary that the notice be in one document so long as the alleged contemnor receives the information required by Rule 35.01(b). We hold that the requirements of Rule 35.01(b) and of due process have been met in this case.

The motion for attachment, which petitioners received, carried in its title the information that it was sought pursuant to Rule 35.01 (in addition to 92.15). Rule 35.01 relates only to criminal contempt. The reference to Rule 35.01(b) sufficiently advised petitioners that criminal contempt was involved. Additionally, the court's order appointing the special prosecutors made such appointment "to prosecute notice for criminal contempt * * *." In open court on May 11, with all petitioners present, counsel for petitioner Mechanic stated:

"* * * I think the court has already indicated by its ruling that it is proceeding under civil as well as criminal contempt, is that correct?"

"The Court: Yes."

The essential question is whether the petitioners had notice of and understood they were to be tried for criminal contempt. Curtis v. Tozer, *supra*, [12, 13]; United States v. United Mine Workers of America, *supra*. An examination of

---

5. They also contend it fails to comply with Rule 92.15 pertaining to civil contempt, but in view of our holding that the civil contempt power was improperly exercised here we need not consider the requirements of 92.15.

this transcript can leave no doubt that petitioners were aware, well before trial, that they were being tried for criminal contempt.

■ The motion for attachment also specifically sets forth the acts which each petitioner was alleged to have done in violation of the restraining order and the date and place of occurrence. In respect to petitioner Murphy, she was charged with unauthorized entry into the R.O.T.C. facility, the very ground upon which the court based its finding of contempt. In the case of the other petitioners the charge was contempt "by throwing bricks, stones, and other missiles in, upon and about said Reserve Officers Training Corps facilities," also the very acts for which they were found in contempt. All petitioners were charged with "engaging with others in said company of approximately 600 persons in chanting, loud, boisterous, tumultuous conduct resulting in the interference with, intimidation and harassment of plaintiff's employees and the normal conduct of the Washington University operations." The charges were sufficiently definite to advise the petitioners of the conduct claimed to be contemptuous and to allow them to prepare their defense.

■ The time and place of hearing were not set forth in the motion to attach or the attachment itself but on May 6, in open court, with the petitioners present as a result of the attachment, the court set a time and place for hearing on the contempt charges which was thereafter extended, again in open court with petitioners present. We do not find it necessary for the court in its order of attachment to·set a time and place for hearing if it does expeditiously thereafter inform the petitioners of such time and place. The rule provides that the time of hearing shall be set so as to give necessary time to prepare a defense. The determination of when hearing shall be held is to some degree dependent upon what petitioners consider necessary time under the circumstances of the

case. We cannot consider it improper procedure for a court to delay setting a date for hearing until it has 'an opportunity to hear an alleged contemnor's views on necessary time. Certainly in this case none of petitioners' rights were prejudiced by the procedure adopted. No contention is made nor could any be made that petitioners were denied counsel or the right to present witnesses and evidence. Petitioners were not denied due process in this proceeding nor do we find any violation of the procedures set forth in Rule 35.01(b).

We now reach the merits. In order to sustain the convictions here two findings beyond a reasonable doubt must be made as to each petitioner—actual knowledge of the restraining order and conduct in violation of the order. The restraining order by its express language restrained only specific persons, aiders and abettors, persons acting in conjunction with defendants and "all other individuals who may gain actual knowledge of this Order * * *" We deal first with knowledge. As to petitioners Kogan and Mechanic, no problem exists as both were parties to the original litigation and had been served with the restraining order. As to the remaining petitioners some discussion is required of the University's attempts to bring the restraining order to the attention of its students and others on its campus.

On March 24, after the issuance of the temporary restraining order, the Chancellor of the University issued a statement to all students of the University. It referred to the restraining order in its main body and stated the order prohibited "the conduct described on the next page." Attached to the statement was a second page entitled "Conduct Prohibited by Temporary Restraining Order of the Circuit Court of St. Louis County." Then followed virtually word for word the four numbered paragraphs of the order heretofore set out in footnote one. Distribution of the Chancellor's statement and the attached sheet was made as follows: 1) A copy of each was

placed in the combination-lock mailbox of each student residing in the University dormitories (approximately 2000 copies); 2) copies were placed in the mailboxes for departments of the University and fraternities and sororities (approximately 1800 copies); 3) copies were distributed to certain buildings extensively used by students and there left on tables or other places where they could be picked up by students (Holmes Lounge—500 copies, Olin Library—500 copies, Women's Building—150 copies, Umrath Cafeteria—150 copies, McMillan Cafeteria—150 copies, Medical School—unspecified); 4) the statement and attached sheet were printed in full in the student newspaper, Student Life, of March 27, 1970, on page 8 and approximately 7000 copies of the newspaper were distributed. Additionally, copies of the restraining order itself were posted on three prominent bulletin boards on the campus; the restraining order was published in full in the March 27 issue of Student Life on page 8; the campus security chief read paragraph 4 of the order to groups of students on several occasions through a bullhorn.[6] There was also from March 24 through May 4 considerable, repeated newspaper coverage in the St. Louis daily press of the occurrences at Washington University including the issuance of the restraining order. Frequent large meetings of students and others occurred in Holmes Lounge following the issuance of the restraining order at which the restraining order was discussed.

■■■■ Knowledge of the restraining order, just as other facts, can be established by circumstantial evidence. But just as with any other fact necessary to conviction, the circumstantial evidence must be consistent with the hypothesis of guilt and inconsistent with any reasonable hypothesis of innocence. The proof of the elements of criminal contempt must be beyond a reasonable doubt. Curtis v. Tozer, Mo. App., 374 S.W.2d 557 [19]. We turn to the individual petitioners.

■■■■ Margaret Murphy was not a student at the University. There was testimony, however, that she attended a meeting at Holmes Lounge on March 24, at which the temporary restraining order was discussed extensively. During the course of the discussion she spoke for approximately two minutes during which she referred to the restraining order as a "paper pig" and "another form of repression." Such evidence was sufficient to warrant the court's findings that she had actual knowledge of the restraining order.

Joel Achtenberg was employed by the University but was not a student. Captain Abernathy, the University security chief, testified that he knew Joel Achtenberg and had known him for some time prior to March 26. On March 26, in the R.O.T.C. area Captain Abernathy read twice that portion of the restraining order having to do with disturbing the property of the University over his bullhorn to a crowd of approximately 200 persons. He stated Joel Achtenberg was part of that crowd. Such evidence is sufficient to warrant the court's finding that Joel Achtenberg had actual knowledge of the restraining order. The Captain's subsequent statement that some attempt was made to shout him down does not prevent the conclusion that those persons in the crowd heard the amplified reading of a portion of the order, that portion Achtenberg was found guilty of violating.

As to petitioners Bothwell, Ryan and Winkler we are confronted with a different situation. In their brief here and on oral argument the special prosecutors appointed by the Court have admitted that actual knowledge of these petitioners must be based on the extensive publicity given

---

6. Although the witness testified he was under orders to read the order anytime there was a gathering of a crowd, there is no evidence the order was read on the evening of the riot and no explanation of why the order was not read.

to the order both by the University and the daily press. The prosecutors admit, and on the record before us we concur, that no evidence is present which directly shows these petitioners were aware of the order. The findings of fact of the trial court as to these three petitioners recited the extensive publicity and stated the petitioners had actual knowledge. This is in contrast to the specific findings as to the other petitioners of actual knowledge based upon factual findings heretofore set out as to those petitioners. We conclude the court's finding of actual knowledge as to Ryan, Winkler and Bothwell was based upon the extensive publicity given the restraining order by the University and the press. None of the three resided in dormitories; all lived off campus. Bothwell attended the Eden Farm campus at Pacific, Missouri, some distance from the main campus and there is no evidence that the documents circulated by the University ever reached Eden Farm campus. None of these three petitioners was identified at meetings where the order was discussed, none was placed at gatherings where the order or any part of it was read.

█ In view of the proceeding here where the essence of the contempt is the knowing violation of a court order we are unable to conclude that the essential element of notice or knowledge was established as to these three petitioners beyond a reasonable doubt. As indicated, circumstantial evidence may be used to establish this element. But such evidence must lead to the conclusion that in fact these petitioners had actual knowledge of the order. We do not believe it necessary for the prosecution to establish that in fact the petitioners read a copy of an order received by them. Nor is it necessary to establish that they listened to an order read to a gathering of which they were a part. Such proof would be very nearly impossible. But there must be some evidence of record to put the individual petitioner into a place or position where the existence of the order was called to his attention.

Mere presence in a community or potential access to the information, no matter how widespread the publicity, cannot be held sufficient to confer actual knowledge in the absence of evidence showing the matter was brought to the individual's attention. In Curtis v. Tozer, *supra*, the evidence established the reading of the injunction in the presence of the petitioners. Such proof is sufficient to support a finding of knowledge. Here too the evidence placed petitioners Murphy and Achtenberg at places where the order was discussed or read, and we have held that sufficient.

We are not unaware of the substantial burden imposed by the law or of the difficulties the law imposes in enforcement of the order of a court in this type of situation. One who knowingly interferes with the orders of a court should be punished, but the threshold question is knowledge. That question must be determined by what the individual actually knew established by direct or circumstantial evidence, not what he should have known or could have known.

A quite similar situation was involved in Garrigan v. United States, 7 Cir., 163 F. 16, where an injunction had been issued in a labor dispute. The defendant had participated in mob violence contrary to the terms of the injunction. The evidence to establish the knowledge of the injunction was the extensive publicity through newspapers and the notices of it posted on the wagons which the mob attacked. The Seventh Circuit reversed the conviction of the defendant on the ground that such publicity did not establish the actual knowledge of the defendant—a fundamental requisite of the charge. See also In re Lennon, 166 U.S. 548, 17 S.Ct. 658, 41 L.Ed. 1110; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 8 Cir., 124 F. 736; In re Rice, C.C., 181 F. 217.

█ The Missouri courts have consistently held that actual knowledge is required to support a contempt conviction. See In re Coggshall, 100 Mo.App. 585, 75

S.W. 183; Ex parte Dillon, Mo.App., 96 S.W.2d 1095; Engel Sheet Metal Equipment, Inc. v. Shewman, Mo.App., 307 S. W.2d 694; Curtis v. Tozer, *supra.* The evidence in this case establishes only that these three petitioners should have known or could have known of the existence of the restraining order. That evidence does not establish that they did in fact know. The sentences and judgments of Bothwell, Ryan and Winkler must be set aside and their release ordered.

■■■■ This brings us to the evidence of violation of the order by petitioners Mechanic, Kogan, Murphy and Achtenberg. Each challenges the findings of the court of specific acts in violation of the order as unsupported by the evidence. At the outset it is not inappropriate to state some general matters pertinent to the questions of violation of the order. Petitioners seek to have the evidence reviewed on the basis of the individual acts of each petitioner, totally divorced from the overall activities of the night. This we decline to do. The purpose and intent of the restraining order was to prevent a repetition of the prior occurrences on the campus in which a large group of individuals acting as a mob had destroyed and damaged University property and interfered with University activities. It was not intended to cover, (although possibly it did cover) the isolated, totally individual actions of persons on the campus which might constitute illegal conduct. It was directed to mob action—to riot. It is the essence of riot that the damage and injury which results is the product of the force of numbers, not of the seriousness of the individual actions. It is the inability of the security and police forces to cope with the sheer numbers of participants that creates the danger inherent in a riot. So it was on May 4 and 5 at Washington University. A mob of from 600 to 2000 persons, claiming a right to destroy the property of another, marched on the R.O.T.C. facility, damaged it substantially, eventually burned it, and in the process seriously harassed police and firemen attempting to perform their duties. We have no qualms in holding that any individual participating in the activities of the mob was in violation of the temporary restraining order issued to prevent exactly what occurred. And we totally reject the contentions that verbal encouragement of the mob or arm motions (the right-on salute) serving as encouragement does not constitute participation but is instead an exercise of free speech. Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471; Gompers v. Bucks Stove and Range Co., 221 U.S. 418, l.c. 439, 31 S.Ct. 492, 55 L.Ed. 797; Bullock v. United States, 6 Cir., 265 F.2d 683, l.c. 694; Kasper v. Brittain, 6 Cir., 245 F.2d 92, l.c. 95. We are not holding that mere presence at the scene of the riot alone was participation in it, or would constitute a violation of the court's order. See Curtis v. Tozer, *supra,* [23, 24]. But when the actions of the individual moves from mere presence to encouragement, incitement, exhortation, or evidenced support for the actions of the mob then participation in the mob action commences. Were we confronted by a *de novo* review of this proceeding, unfettered by the findings of the court below, we would have little question that the evidence supports a finding of participation in the mob action by the four petitioners now under consideration.

■■■■ But we are not so unfettered. Rule 35.01(b) requires that the trial court make specific findings of the essential acts constituting contempt and on review by habeas corpus we are limited to whether those findings are supported by the evidence. We must find "* * * that evidence supports the finding, beyond a reasonable doubt, that the petitioner acted as stated in the *specifications* found as to him or her." Curtis v. Tozer, *supra,* [20] (emphasis supplied). It is not necessary that we find support for all specifications however, for if even one of the specifications was established by the requisite proof then that petitioner is not illegally restrained and our writ should be quashed. Curtis v. Tozer, *supra,* [20]. In determining that

question we defer to the opportunity of the trial judge to observe the witnesses and determine their credibility. And we also consider the activities of the mob as a whole as it relates to the testimony concerning the individual actions of these petitioners. We do not treat their actions in the vacuum suggested by these petitioners. Such treatment does not affect the testimony concerning their actions, but it does affect the inferences which can be drawn from their actions. We also must consider that the term "beyond a reasonable doubt" does not mean beyond all possible doubt.

The finding as to petitioner Murphy by the court was that during the riot she "did enter in and upon said [R.O.T.C.] facility, without cause or authority so to do, through a door which had been broken down, and did remain within said facility for a period of time." Mrs. Helen Spigel, a University employee, testified that after the rock barrage against the building and after the door had been ripped off she saw Margaret Murphy enter the R.O.T.C. facility and did not see her come out. There was no evidence contrary to this testimony.

■ Petitioner Murphy contends the evidence is insufficient to establish that her entry was unauthorized. At the time petitioner Murphy entered the building its windows had been broken, its door had been ripped off, police were attempting to control the mob and protect the building. We think the only permissible inference to be drawn from the evidence was that this petitioner's entry into the building was without authority and was in contempt of the court's order.

As to petitioner Kogan the court found that during the riot he "did throw a round explosive device towards the said [R.O.T. C.] facility in the direction of a group of police officers acting within the scope of their duties and authority in attempting to protect and conserve plaintiff's property, which device exploded nearby said police officers."

■ A student, Donald Bird, testified he saw Kogan make a throwing motion and observed an object that looked like a cherry bomb leave his hand in the direction of a policeman, which object exploded. Petitioner Kogan contends there was no evidence that anyone was harassed, intimidated or interfered with. At the time police were attempting to protect the property and control the crowd and the officer at whom the object was aimed was approximately 30 feet from petitioner. The police were throughout the night subjected to thrown rocks and firecrackers. We believe the evidence warrants the conclusion beyond a reasonable doubt that this petitioner threw an explosive device at a police officer performing his duty and that under the circumstances then prevailing such act interfered with the police officer. Under the conditions then existing Kogan's act was a part of the actions of the mob which unquestionably was harassing to the police and interfered with their performance of duty. The evidence by other witnesses that they did not see Kogan throw anything does not in any way negate the testimony of Mr. Bird that he did see Kogan throw a cherry bomb.

Witness Bird also testified that at about the same time he saw Kogan throwing, he also saw petitioner Mechanic shoot a cherry bomb with a slingshot towards a police officer the same distance away as he testified to concerning Kogan. The cherry bomb exploded at the policeman's feet. He stated Kogan and Mechanic were standing next to each other. He also testified that on a second occasion he saw Mechanic take cherry bombs from his girl friend's purse and put them in a slingshot but did not see him shoot them. On cross-examination he stated he did not see the slingshot in Mechanic's hand until after he saw the cherry bomb explode. He stated when he first saw the cherry bomb it was within a foot of Mechanic's body. He also stated "It could have come, perhaps, from someone standing about five or six feet behind" Mechanic, although he did not consider

this reasonable. There is no indication there was anyone five or six feet behind Mechanic and subsequently the witness stated "I saw the cherry bomb coming from the person of Howard Mechanic."

The court found that the petitioner "did let fly from a slingshot, or otherwise propel, towards the said [R.O.T.C.] facility in the direction of a group of police officers acting within the scope of their duties and authority in attempting to protect and conserve plaintiff's property, a round explosive device, which device exploded nearby said police officers."

We believe the evidence supports this finding. Mechanic had a slingshot in his possession, and had access to cherry bombs. Bird saw one within a foot of Mechanic's body, in the air. Although admitting the possibility it could have come from five or six feet behind Mechanic he did not consider that reasonable. We do not consider the evidence equivocal. Bare possibility of a contradictory fact does not mean that reasonable doubt exists. For the reasons stated in connection with Kogan we reject the contention that no harassment or interference was shown. Again the evidence of Mechanic's witnesses does not require a finding that the testimony of Bird fails to establish Mechanic's guilt.

The court found that petitioner Achtenberg threw a rock toward the facilities while other individuals were throwing rocks. Mrs. Spigel testified that while there was a hail of rocks against the building she saw Achtenberg make a "throwing motion." She did not see any object leave his hand. He was in a group of people about 15 feet from the building. At that time he was facing the building and he made the motion toward the building and there were people in his vicinity making similar motions. On cross-examination she was asked "Could that motion you saw possibly have been that sort of a gesture [right-on salute]?" Her answer: "I suppose it could have been." On redirect the following testimony was given:

"Q I wonder if you could particularly describe the action you saw Joel Achtenberg make.

"A Again, it was a forward motion of the arm.

"Q Did you see his arm go from back to front?

"A I did not see the entire action of his arm. Again, it was already in the air when I saw it. I simply saw that his arm was raised and that it was moving forward."

On recross examination the following occurred:

"Q Mrs. Spigel, despite your answer on redirect with regard to Joel Achtenberg, is it still your opinion that the gesture you saw him make could have been or possibly was a right-on gesture? A It could have been."

Her testimony is only that there was a possibility it was a "right-on salute" and we do not believe that her answer on cross-examination negates her previous testimony that Achtenberg made a "throwing motion" and what she described fitted a throwing motion. Since there is nothing of record to indicate how a right-on salute is properly done we cannot presume that the description also fitted that action. Taking all the testimony and the reasonable inferences to be drawn therefrom we believe the court's finding that Achtenberg threw a rock is supported beyond a reasonable doubt. The throwing movement took place when a hail of rocks were being thrown, petitioner was in a group making similar motions, was quite close to the building, and made the motion toward the building. We do not consider it an impermissible inference that an individual making a throwing motion threw something, particularly under the circumstances and conditions described. The testimony concerning a "right-on" salute was not a statement of fact but only a statement of possibility or of opinion. As such it goes to the weight to be given her testimony, but it

does not require the trial court or this court to disregard her testimony of a fact —that Achtenberg made a throwing motion. State v. Spraggins, Mo., 368 S.W.2d 407.

We reject also petitioner Achtenberg's contention that violation of the restraining order required proof that he hit the building. Under the riotous circumstances prevailing at the time his conduct was in violation of the restraining order.

Each petitioner raises the contention that the proof is fatally defective because no in-court identification of petitioners by the witnesses was made. Each witness who testified to contemptuous conduct stated they knew by sight and name the individual against whom they testified prior to May 4. They each stated they saw the named individual commit the acts about which they testified. The contemnors on trial bore the same names as the individuals whose conduct was described. Identity of names is *prima facie* evidence sufficient to establish defendant's identity. State v. Harris, Mo., 452 S.W.2d 577; State v. Davis, Mo., 367 S.W.2d 517; State v. Martin, Mo., 395 S.W.2d 97. The witnesses were testifying about people known to them prior to the riot who bore the same names as the persons in the courtroom. In-court identification was not essential to a finding of guilt under the circumstances, particularly where, as here, there was no evidence to rebut the *prima facie* evidence of identity.

Petitioners raise one additional point. They profess that Washington University's selection of them to be prosecuted for contempt was an arbitrary selection and denied them due process. To the extent this contention is based on the proposition that unless the University seeks prosecution of all rioters (known and unknown) it may not seek prosecution of any, we reject the contention as ludicrous. To the extent it attempts to invoke the doctrine that selective enforcement of an extremely broad prohibitory statute or order is unconstitutional as a violation of equal protection of the laws (see Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487), it fails for lack of evidentiary support. The only selectivity shown here was the determination by the special prosecutors that they had evidence to support a contempt case against these petitioners. There is no evidence that they had such evidence as to any other person participating in the riot. It can be conceded that, unlike the Bank in Curtis v. Tozer, *supra*, the University was inadequately prepared to obtain evidence of participants in a riot which it had some warning might be coming. But we cannot hold that such lack of preparation was a part of a plan to prosecute these petitioners while letting other known participants go free.

We have found it unnecessary to discuss in detail the eighty plus cases cited to us by petitioners. Careful review of the cases cited and our own independent research has led to the legal determinations expressed herein. To the extent petitioners have inferentially raised other contentions as adjuncts to their main points, what we have said in regard to the main points disposes of the inferential contentions.

It follows from what has been said herein that 1) the jail sentences imposed on all petitioners for civil contempt were illegal and are set aside; 2) petitioners Michael A. Ryan, William Bothwell and Dennis Winkler are illegally restrained in that the evidence does not support the finding that they had actual knowledge of the temporary restraining order and they are ordered discharged forthwith; and 3) petitioners Howard Mechanic, Joel Achtenberg, Margaret Murphy and Lawrence Kogan are not illegally restrained on their sentences for criminal contempt and as to those sentences our writ should be and is quashed and those petitioners are remanded to the custody of respondent.

WOLFE, P. J., and BRADY and DOWD, JJ., concur.