Ex parte John Sherman **MILES.**

No. 24585.

Kansas City Court of Appeals.

Missouri.

Aug. 11, 1966.

Lewis E. Pierce, Robert G. Duncan, Pierce, Duncan, Beitling & Shute, Kansas City, for petitioner.

Lawrence F. Gepford, Jackson County Pros., R. Bruce Sears, Asst. Pros. Atty., Kansas City, for respondent.

## ORIGINAL PROCEEDING IN HABEAS CORPUS

BLAIR, Judge.

This is an original proceeding in habeas corpus by which the petitioner, John Sherman Miles, seeks to be discharged from the custody of Arvid Owsley, Sheriff of Jackson County, who restrains him of his liberty by virtue of a commitment for contempt entered against him by the Circuit Court of Jackson County on a charge and judgment that Miles attempted to tamper with a juror and thereby to interfere with the administration of justice. The circuit court sentenced him to confinement in the county jail for 12 months and to pay a fine of $1,000.00. Sufficient it is to say that appropriate pleadings have put this proceeding properly at issue and that it has been submitted to us on these pleadings, the transcript of testimony on which the trial court based its commitment, the commitment itself, and the oral arguments and written briefs in this court.

Our view of this controversy requires that we set out the commitment in full to enable easy comparison of its recitals with the observations and rulings we make in

deciding this proceeding. Its recitals follow:

"Now on this 30th day of March, 1966, the Court having heretofore on March 23, 1966, heard the evidence in this matter and taken the same under advisement, now on this day being fully advised, finds beyond a reasonable doubt as follows:

"1. That on January 31, 1966, John Sherman Miles, contemnor herein, made two telephone calls to one Cecil L. Wendleton, a person acquainted with one Fred L. Johnson, who was on that date serving as a juror in criminal cause C–34186 entitled State of Missouri vs. John Sherman Miles, which cause was then being tried in Division No. 11 of this court before the Honorable J. Donald Murphy; that in said telephone conversations, contemnor herein, requested and solicited the said Wendleton to attempt to bribe and tamper with said juror Johnson by offering to pay two hundred dollars each to said Wendleton and Johnson, if said juror Johnson by his conduct could in some manner obtain a mistrial in the criminal case then being tried, and contemnor requested said Wendleton to contact said juror Johnson and inform him of the proposed bribe.

"2. That on the same date said Cecil L. Wendleton was also contacted on the telephone by one Al Sullivan, a person with whom contemnor was acquainted, and that said Wendleton was asked by Sullivan to contact juror Johnson on behalf of the contemnor herein who was the defendant in the criminal cause then on trial.

"3. That the said Cecil L. Wendleton did contact juror Johnson pursuant to Sullivan's request and talked to him about the case in which Johnson was then sitting as a juror, and attempted to influence said Johnson's judgment as a juror by telling him that he, Wendleton, was personally acquainted with John Sherman Miles, and that he would ap-preciate it if Johnson would stand up and say a good word for Miles.

"4. That in addition to the two telephone calls made directly by contemnor to Wendleton, contemnor Miles procured the said Sullivan to call Wendleton and ask Wendleton to contact juror Johnson with the intention of affecting said juror Johnson's judgment in the case in which he was then sitting as a juror.

"5. That by reason of the foregoing facts, contemnor is guilty of an attempt to tamper with the said juror Fred L. Johnson, and such conduct on the part of contemnor constitutes a criminal contempt on this court and an interference with the administration of justice."

The petitioner and the respondent are in agreement that the commitment is for indirect criminal contempt and they are correct. Ex parte Clark, 208 Mo. 121, 106 S.W. 990, 996–998, 15 L.R.A.,N.S., 389; Curtis v. Tozer, Mo.App., 374 S.W.2d 557, 568. The petitioner contends that a review by us of the evidence before the committing court will establish that it was insufficient to support the commitment and therefore that he is entitled to be discharged. Although the petitioner and the respondent are in disagreement concerning the extent of the review we must make of the evidence, an unvarying line of decisions firmly establishes the rule that the commitment is not conclusive on us and that it is our duty to go behind its recitals and to analyze all of the evidence on which they are based and to determine whether they are supported by the evidence. Ex parte Creasy, 243 Mo. 679, 148 S.W. 914, 41 L.R.A.,N.S., 478; Osborne v. Purdome, Mo., 250 S.W.2d 159; Curtis v. Tozer, supra, 374 S.W.2d l. c. 570. Furthermore, if we find that the recitals of the commitment are supported by the evidence, we must further find that such evidence establishes petitioner's guilt of indirect criminal contempt beyond a reasonable doubt. In Curtis v. Tozer, supra, l. c. 581, the St. Louis Court of Appeals, dealing with a habeas corpus proceeding

brought by a number of petitioners committed for indirect criminal contempt, said: "Those jurisdictions in which contempt proceedings are regarded as quasi-criminal in nature require a standard of proof greater than a mere preponderance of the evidence but less than beyond a reasonable doubt. 12 Am.Jur., Contempt, Sec. 75. We are spared the difficulties attendant upon putting into words a degree of proof that would be between those poles. In Missouri, although we deny that such proceedings are criminal in nature, Osborne v. Purdome, Mo., 244 S.W.2d 1005, 1. c. [8, 9] p. 1012, 29 A.L.R.2d 1141, we require that guilt be proved beyond a reasonable doubt. Osborne v. Purdome, Mo., 250 S.W.2d 1. c. [11] p. 163." Following this declaration of the law, the court examined the testimony for and against each petitioner and determined as to each whether he was guilty beyond a reasonable doubt. The petitioners not shown to be guilty beyond a reasonable doubt were discharged.

The relevant evidence we must review was as follows: Fred L. Johnson testified that on January 31, 1966, he was serving as a juror in the Circuit Court of Jackson County in a criminal case entitled "State of Missouri v. John Sherman Miles", the petitioner. The trial commenced on that day and was recessed at 4:30 P.M. until the next day. Johnson went home and shortly received a telephone call from Cecil Wendleton who worked with him as a meat cutter at Topper's Food Market in Kansas City. Asked what the nature of the call was, he testified "Well, he asked me what I was doing, how the trial was proceeding, and I proceeded to ask him what trial he meant. Kind of caught me off guard wondering how he knew I was on a trial, being as I was just going down for jury duty. So I proceeded to ask him. He said the trial you are on. I said 'What trial do you mean?' He said 'John Sherman's trial'. I said 'How do you know that?' He said, 'I just know it.' I says, Well, Cecil you will have to tell me because this could have some bearing

on my thought as far as this man's trial. I am supposed to be able to have a clear conscience on the man's trial. * * * I just told him that I had to know because it could have a bearing on the trial, and I wanted to give a fair decision to this man, as fair as I could, and I was told when the trial started that if I knew anybody that knew anybody on the trial that I shouldn't be on the jury." According to the record, this is the extent of the conversation Johnson said he had with Wendleton that day. However, Johnson testified that the conversation "worried" him and the next morning he called Wendleton "and told him exactly that I needed to know what I asked him the day before, and I said, I just asked him if anybody had wanted me to do anything and he said no, that he was just wondering how the trial was going." When he. went to court that morning he informed the judge of these conversations and a mistrial was declared.

Cecil Wendleton testified that on January 31, 1966, "about 5:15" P.M. one Al Sullivan telephoned him. The testimony of what Sullivan said to Wendleton during this call is woefully sketchy, obscure and unsatisfactory. The most that was elicited from Wendleton regarding the subject of Sullivan's call resulted from an effort finally made by the court: "The Court: Did Sullivan say anything to you about the Miles case? The Witness: Yes. The Court: Until you got the call from Sullivan, did you know that your friend, Johnson, was on the Miles case? The Witness: No, sir." He testified that Sullivan requested him to call Johnson as a personal favor to him. A study of this record from end to end fails to disclose exactly what Sullivan wanted Wendleton to say to juror Johnson, unless it is to be inferred from what Wendleton did say to him when he called him at Sullivan's request about five minutes after Sullivan's call. He testified: "I said, Hello, Fred, how are you," and he said, 'Hello Cec', he calls me instead of Cecil, and I said, 'How is your jury duty doing,' something like that,

and I think he said, 'All right' and I asked him, I said, 'What is it, the John Miles case?' and he said 'Yes'—he didn't say yes, he said 'How do you know that?' I told him I had heard it and—I am trying to remember. He kept asking me how I knew it, and I told him I had just heard it and that I had known him (petitioner) a long time. If he (Johnson) would stand up and say a good word, or something like that. * * *." He also testified that he told Johnson that Miles was his friend and that he was "a good boy, or something like that." He admitted that juror Johnson did call him the next morning but his version of the conversation differs from that of Johnson. "Q. What was the nature of that conversation? A. He told me what he had to do. Said he had talked with the deputy sheriff, I believe it was, and the Judge, and disqualified—not disqualified hisself, I guess, just tell them what had happened, because I wasn't supposed to know that, or anything about it, and said that he would have to go in and tell everything, say everything." Wendleton testified that he knew Sullivan. Sullivan owned the Intercity Market. He had "traded" there. "I used to work for him off and on, but he never called me" (before). He testified that he was also acquainted with the petitioner and that petitioner went to Sullivan's market, "I think, to cash checks once in a while. He used to."

Wendleton further testified that shortly after he finished his call to Johnson he received a call from petitioner "about five thirty—quarter to six, something like that". He asked petitioner where he had gotten his phone number and petitioner said he got it from Al Sullivan. Petitioner asked him whether he knew juror Johnson and he told him he did. He asked petitioner "What kind of trouble are you in?" and petitioner answered "Some kind of deal over a tractor or stolen merchandise." "He just said that he would, it would be worth it to him if he could get a mistrial, and he would give us both (Wendleton and

juror Johnson) $200 apiece, and he wouldn't have to come in contact with" Johnson. "He didn't say how the money was going to get to me" at that time. Later that night, "must have been about 8:30 or 9 o'clock", petitioner called him again "and asked me if I had got ahold of Fred (Johnson) and I said 'No' and he asked me if I would go through with it, and I said, 'I don't think so.'" Again petitioner offered to pay Wendleton and juror Johnson $200.00 "apiece" if he could get a mistrial.

Juror Johnson did not testify that this offer was ever conveyed to him by Wendleton. Wendleton swore that he did not convey this offer to Johnson and no one asserts that his testimony in this regard is untrue or that this offer was ever conveyed to juror Johnson by any one in any way.

Al Sullivan testified that he knew both petitioner and Wendleton. He swore that he had never made a telephone call to Wendleton about petitioner's case or about juror Johnson.

Petitioner denied that he had "procured" Sullivan to call Wendleton. He denied that he called Wendleton or that he ever mentioned his predicament to either Sullivan or Wendleton until some days after the mistrial was declared. He admitted knowing Sullivan and Wendleton.

■■ We examine the evidence to determine its sufficiency to support the commitment, and if it does, we will then examine it to determine whether it establishes petitioner's guilt beyond a reasonable doubt. First, we examine paragraph 4 of the commitment which declares: "(C) contemnor Miles *procured* the said Sullivan to call Wendleton and ask Wendleton to contact juror Johnson with the intention of affecting said juror Johnson's judgment in the case in which he was then sitting as a juror." (Emphasis supplied) Of course, there is no direct evidence that petitioner procured Sullivan to ask Wendleton to influence juror Johnson. Accord-

ingly, the holding of the trial court that he did so must be based entirely, if at all, on circumstantial evidence. Circumstantial evidence is insufficient to establish petitioner's guilt unless the circumstances and facts relied on to establish his guilt are not only consistent with each other and with the theory of his guilt, but are also inconsistent and irreconcilable with his innocence, and they must point so clearly and satisfactorily to his guilt that they exclude every reasonable theory of his innocence. State v. Burton, Mo., 357 S.W.2d 927; State v. Walker, Mo., 365 S.W.2d 597; State v. Stoner, Mo., 395 S.W.2d 192. Moreover, the rule in criminal cases that circumstantial evidence is insufficient to establish guilt, if it serves only to raise a mere suspicion of guilt, however strong that suspicion may be, is the same rule that applies in contempt cases. Robertson v. Johnson, 210 Mo.App. 585, 243 S.W. 215; State v. Rogers, Mo., 380 S.W.2d 398; State v. Jones, 363 Mo. 998, 255 S.W.2d 801. Besides, circumstantial evidence which establishes no more than a motive, an intent and an opportunity to commit an offense, standing alone, is insufficient to establish guilt. State v. Rogers, Mo., 380 S.W.2d 398; State v. Ramsey, Mo., 368 S.W.2d 413.

On this record, it can be found that petitioner had a motive to procure some one to ask Wendleton to influence juror Johnson. Certainly the two calls the record shows he made to Wendleton to offer him $200.00 to pay juror Johnson $200.00 to insure a mistrial justifies a finding that he had a motive and an intent to influence juror Johnson. It shows, perhaps, because of his acquaintance with Sullivan, that he had an opportunity to try to procure Sullivan to ask Wendleton to try to influence juror Johnson. Assuming that petitioner had a motive, an intent and an opportunity to induce Sullivan to call Wendleton and ask him to try to influence juror Johnson, just where is the evidence that he did it? The concurrence of a motive, an intent and an op-

portunity to commit the contempt charged against him, standing alone, does not make guilt. The record must show that, by some word or deed, overt or covert, he *did* procure Sullivan. The facts and circumstances we have recited from the testimony fail utterly to establish, beyond a reasonable doubt, or at all, that the petitioner "procured" Sullivan to do anything, regardless of petitioner's motive, intent or hope to secure a mistrial and regardless of what either he or Sullivan asked Wendleton to do. We do not overlook that the committing court believed that Wendleton's evidence that Sullivan called and asked him to try to influence juror Johnson, coupled with petitioner's two *later* phone calls to Wendleton, somehow established that petitioner "procured" Sullivan. We have answered this theory by demonstrating the lack of evidence that petitioner actually "procured" Sullivan to call Wendleton and that petitioner's two *later* phone calls to Wendleton establish no more than motive and intent to influence juror Johnson as they relate to the fundamental and vital inquiry: Did petitioner *procure* Sullivan?

It is true that a study of this record raises a strong suspicion that petitioner "procured" Sullivan, but suspicion alone is not sufficient in our system that requires proof beyond mere suspicion, and we cannot rule this cause out of outrage and assume guilt on evidence we are forbidden to accept as enough. On this record, we must follow established principles and we must hold, as we do, that the facts and circumstances before us are wholly insufficient, absent evidence, direct or circumstantial, and it is not present, establishing that petitioner, by some word or deed, overt or covert, actually procured Sullivan to ask Wendleton to try to influence juror Johnson.

We now consider whether the two phone calls made by petitioner to Wendleton offering him $200.00 to bribe juror Johnson by paying him $200.00 to bring about a mistrial rendered petitioner guilty of "an attempt to tamper" with juror Johnson

which constituted "criminal contempt" and "an interference with the administration of justice" as the committing court found. Commitment, supra, paragraphs 1, 5. As observed already, juror Johnson did not testify that this offer was ever conveyed to him by Wendleton. In his testimony, he was not even interrogated about it and it was not even mentioned. Wendleton swore that he did not convey this offer to juror Johnson. No one asserts that he did. Indeed, it is conceded that he did not. In these circumstances, our duty is to follow the ruling of the Supreme Court in an analogous proceeding, In Re Elliston, 256 Mo. 378, 165 S.W. 987, 990: "All of the authorities seem to agree that a court of general jurisdiction has the inherent authority to punish for contempt any person who willfully or wantonly attempts, by any means whatsoever, to improperly influence a juror in the impartial discharge of his duties as such, whether by conversation, attempt to bribe, or to exert any undue influence with an officer in the selection of the personnel of the jury. 9 Cyc. p. 16, par. 2 and cases cited. But after a careful reading of the numerous cases there cited I have failed to find a single case where the court has punished a person, as in this case, where he in no manner approached, discussed, or offered to bribe the juror or officer in person. In other words, the courts seem to attach to the words, 'to attempt to influence a juror,' the meaning that the contemner or his representative must approach the juror in person before the contempt is completed.

"In the case at bar the appellant requested Highsmith to see the juror for him, but Highsmith never did so, nor did he ever intend to so do. That being true, the juror was not influenced, nor was he attempted to be influenced, in his action as a juror; but the appellant attempted to have Highsmith to influence the juror, which he never did. That conduct of appellant, in my opinion, after a careful consideration of all of the authorities cited,

and which I have been able to find bearing upon the subject, did not constitute contempt of court. If, however, he or Highsmith, his representative, had approached the juror and had in any manner attempted to influence him, then clearly both of them would have been guilty of contempt; but, under the facts as charged in the citation and established by the uncontradicted evidence, neither of them was guilty of contempt. * * *.

■ "The Legislature evidently entertained the views here expressed, and in order to punish those who might be guilty of such misconduct enacted sections 4356, 4357, and 4894, R.S.1909, (presently Secs. 557.130, 557.140 and 556.150, V.A.M.S.) which have been in force for many years.[1] These statutes cover this case as a glove covers the hand, and should be vigorously enforced whenever their provisions have been violated, as clearly appears in the case at bar. We are, therefore, of the opinion that if the appellant is guilty of the charge stated in the citation, he should be proceeded against under the sections of the statute referred to, and not by citation for contempt of court." Accordingly, we must rule, and we do, that the evidence that petitioner made two phone calls to Wendleton offering him $200.00 to bribe juror Johnson by paying him $200.00 to bring about a mistrial was insufficient to establish that petitioner was guilty of "an attempt to tamper" with juror Johnson which constituted "criminal contempt" and "an interference with the administration of justice."

Although the rulings we have made are entirely dispositive of this proceeding, we will nevertheless examine the commitment, as written, to ascertain whether it was legally sufficient in the first place. Since we have ruled that petitioner's two phone calls to Wendleton and his effort to induce him to bribe Johnson did not constitute criminal contempt and an interference with the administration of justice,

---

[1] Consult also Sec. 557.110 V.A.M.S. This footnote ours.

the recitals of the commitment that he made those calls and exerted that effort are wholly insufficient for the reason that the trial court could not and did not find that petitioner's purpose to bribe juror Johnson was ever conveyed to him by Wendleton. In re Elliston, supra.

We examine the recital in the commitment "That in addition to the two telephone calls made directly by contemnor to Wendleton, contemnor Miles *procured* the said Sullivan to call Wendleton and ask Wendleton to contact juror Johnson with the intention of affecting said juror Johnson's judgment in the case in which he was then sitting as a juror". (Emphasis supplied) Commitment, paragraph 4. Our appellate courts have held consistently and repeatedly that, in contempt proceedings, the facts and circumstances constituting the contempt, and not mere legal conclusions, must be recited in the commitment, regardless of whether the contempt is direct, i. e., arising out of conduct in the presence of the court [Ex parte Stone, Mo., 183 S.W. 1058, 1059; Ex parte Creasy, 243 Mo. 679, 148 S.W. 914, 922, 41 L.R.A., N.S., 478; Ex parte Shull, 221 Mo. 623, 121 S.W. 10, 11] or, as here, is indirect, i. e., arising out of conduct outside the presence of the court. Reardon v. Frace, 344 Mo. 448, 126 S.W.2d 1167, 1168; Osborne v. Purdome, Mo., 244 S.W.2d 1005, 1011, 29 A.L.R.2d 1141; G——— v. Souder, Mo.App., 305 S.W.2d 883, 887 (7, 8); White v. Hutton, Mo.App., 240 S.W.2d 193, 200(9); Ex parte Heffron, 179 Mo.App. 639, 651, 162 S.W. 652, 656. We must construe the commitment strictly in favor of the petitioner, and no inferences, presumptions or intendments are permitted to be indulged against him in order to aid its recitals. Scott v. Davis, Mo. App., 328 S.W.2d 394, 396, and authorities cited. The recital of paragraph 4 that petitioner "procured" Sullivan to call Wendleton and ask him to influence juror Johnson is the merest legal conclusion and, in view of the decisions we have cited, cannot be regarded on any legal theory as

a recital of facts and circumstances constituting a contemptuous procurement of Sullivan by petitioner. Of course, as we have ruled, there is no evidence that petitioner procured Sullivan to ask Wendleton to influence juror Johnson and it was therefore impossible for the committing court to recite any facts and circumstances that justified its mere legal conclusion that petitioner procured Sullivan. For these reasons paragraph 4 of the commitment is wholly insufficient.

Because paragraphs 1, 5, dealing with the effort at bribery, and paragraph 4, dealing with the claimed procurement of Sullivan, contained the fundamental and vital recitals of the commitment, and since we have held that both are fatally defective, it results that the entire commitment is fatally defective.

For all of the reasons assigned, the respondent, Arvid Owsley, Sheriff of Jackson County, does not restrain petitioner of his liberty by authority of a legal commitment for criminal contempt and he must be discharged from custody.

It is so ordered.

All concur.