**STATE ex rel. GIRARD et al., Petitioners,**

v.

**Raymond T. PERCICH,[1] Sheriff of the City of St. Louis, Respondent.**

**Nos. 38271 to 38278 and 38837 to 38841.**

Missouri Court of Appeals, St. Louis District, Division Three.

Aug. 30, 1977.

Motion for Rehearing and/or Transfer Denied Oct. 11, 1977.

---

1. Respondent Percich has been succeeded in office by Benjamin Goins.

Jerome J. Duff, James E. Heckel, St. Louis, for petitioners.

John P. Emde, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, for respondent.

GUNN, Judge.

Petitioners, members and officers of Brewery Drivers and Helpers, Local Union No. 133 of St. Louis affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Union), contest their convictions for criminal contempt in this original habeas corpus proceeding. This appeal involves thirteen cases consolidated for review and concerns thirteen separate petitions. The convictions are based on a finding by Circuit Judge Carl R. Gaertner that specific conduct by individual members, as well as general strike policies promulgated by the executive board of the Union, were willful and deliberate violations of a lawful restraining order issued by him. We believe the evidence supports the finding as to all petitioners, except Robert Woodson.

The incidents involved in these cases arose out of a long-lived and admittedly virulent strike by the Union against the St. Louis metropolitan wholesale beer distributors. On April 22, 1976, suit was filed in St. Louis City Circuit Court by Lohr Distributing Co., Inc. (Lohr), exclusive distributor of Anheuser-Busch products within the City of St. Louis, against specified persons affiliated with the Union in both their individual capacity and as representatives of a class consisting of the membership of the Union. The petition, which sought a restraining order against the Union, charged that the strikers had engaged in numerous unlawful activities including: mass and unruly picketing for the purpose of harassing and obstructing Lohr's customers; harassment, intimidation and threats of physical violence against Lohr's employees and customers; following Lohr's customers from its premises and stopping the customers on public streets in order to assault, abuse and threaten them to coerce a cessation of business with Lohr; and various other acts or threats of physical violence and property damage.[2]

---

2. These included a firebombing of Lohr's premises and threats against the life of its chief operating officer. The petition admitted that these violent acts were committed by unknown persons but alleged that they were directly related to the current strike.

Judge Gaertner issued a restraining order that same day forbidding Union members as well as any other person having notice of the order from:

"a. Obstructing, blocking, stopping or otherwise in any manner interfering with any person or vehicle while the same is entering onto or exiting from any property owned or operated by plaintiff, specifically, plaintiff's facility at 3820 Dr. Martin Luther King Drive, St. Louis, Missouri.

"b. Interfering in any manner, directly or indirectly, with the operation or use by plaintiff or by plaintiff's employees or by plaintiff's agents, of any truck, tractor, trailer or motor vehicle owned, leased or operated by plaintiff or by its said employees or by its agents.

"c. Damaging, abusing or in any manner interfering with the use of any real or personal property owned or operated by plaintiff or by threatening to damage, to abuse or to interfere with the use of any of plaintiff's aforesaid property.

"d. Assaulting, harassing, threatening, injuring, battering, coercing, intimidating or threatening to assault, to harass, to threaten, to abuse, to injure, to batter, to coerce or to intimidate any of plaintiff's customers or any agent, servant or employee of plaintiff while the same is having or attempting to have any business contact with plaintiff.

"e. Interfering directly or indirectly with the purchase, sale, receipt, delivery or distribution of Anheuser-Busch beer products by plaintiff from its facility at 3820 Dr. Martin Luther King Drive, City of St. Louis.

"f. Having in excess of three persons at any one time picketing, congregating or otherwise meeting at, near or about any property owned or operated by plaintiff, at 3820 Dr. Martin Luther King Drive in the City of St. Louis."

In addition, an order to show cause why a temporary injunction should not be issued was filed and a hearing date was set. Petitioners in their answer denied all allegations of violence but admitted that the nominal parties as well as the members of the class had received notice of the restraining order.

On April 28, 1976, the *Lohr* petition was amended to include a second count on behalf of Grey Eagle Distributors, Inc. (Grey Eagle), the exclusive Anheuser-Busch distributor for St. Louis County. Count II alleged essentially similar acts and threats of violence, harassment, intimidation and property damage directed against Grey Eagle, its employees and customers as alleged in Count I against Lohr, its employees and customers.

Specifically, Count II alleged that Grey Eagle's trucks carrying beer from the Anheuser-Busch plant were attacked with various dangerous projectiles on a public highway while on route to its premises; that a loaded tractor trailer truck owned by Grey Eagle was caused to overturn after a striker hurled a baseball bat through its windshield; that the offices of Grey Eagle were ransacked; that telephone threats were made against the lives of Grey Eagle employees; and that the home of the Grey Eagle chairman was firebombed. It was admitted that these acts, except for the tractor trailer incident, were performed by unknown persons. It was alleged, however, that they were directly related to the strike.

Judge Gaertner immediately issued a second restraining order for the relief of Grey Eagle. Its essential terms were identical to the original order except for the addition of paragraph (g) which forbade the Union "[f]rom picketing, congregating or otherwise meeting, at, near or in the vicinity of the intersection of Dorsett Road and Millpark Avenue in St. Louis County, Missouri."[3] The April 22 order was to remain

---

**3.** At the conclusion of the June 3 hearing, Judge Gaertner ordered paragraph (g) stricken from the restraining order, because it had been improvidently included by the court under the mistaken belief that the entrance to Grey Ea-

gle's premises was located at this intersection when, in fact, it was located two blocks away. Although no individual was cited for violation of this paragraph, the evidence shows that the activity which it prohibited was openly and

in effect. The hearing on the order to show cause why a temporary injunction should not be issued was continued numerous times through the month of May by agreement of the parties, but the restraining orders continued in effect.

On May 28, 1976, Lohr and Grey Eagle (plaintiffs) filed a motion for the issuance of citations for contempt and body attachments against petitioners for violations of the restraining orders. The main thrust of the alleged violations was that continued coercion, harassment and intimidation of plaintiffs' customers resulted from the Union's policy of following them from plaintiffs' loading docks, where they purchased beer, to their places of business. Additionally, random acts of vandalism to the property of customers were alleged. On June 1, 1976 a hearing was commenced on this motion which continued until June 3. At its conclusion Judge Gaertner found probable cause to issue citations of contempt against petitioners and ordered them to appear on June 10, 1976 to show cause why they should not be held in civil and criminal contempt of court. He further ordered that each petitioner be served with a notice of prosecution.[4] Attorney for the plaintiffs was appointed special prosecutor to try the charges. At the June 10 hearing further testimony was offered, and the parties stipulated that all evidence presented at the June 1–3 hearing was admitted for the court's consideration.

In reciting the facts we shall not dwell on the many sordid incidents detailed in this voluminous record which did not form the basis for contempt convictions. But the course of this strike, both before and after the issuance of the restraining orders, was marked with fulsome instances of violent and destructive activity directed at plaintiffs, their competitors, and the customers

of both. Some of these actions could be directly attributed to Union members and others could not. Nevertheless, the acts of violence and destruction were well publicized in the local news media and became common knowledge in the community. During this strike an atmosphere of trepidation existed among members of the community.[5] Enmity exploded into vacuous acts. Trucks carrying beer were attacked on public streets with rocks, bricks, ball bearings and other dangerous projectiles. Customers selling plaintiffs' products had the windows of their vehicles and establishments shattered and concrete poured into their plumbing fixtures. There were numerous instances of direct threats against customers because they continued to handle plaintiffs' products. Many customers ceased doing business with plaintiffs during the strike out of fear for their persons and property. Others who continued dealing with plaintiffs employed armed security guards and carried weapons for their own protection. Routine trips to purchase beer became armed caravans through public streets, accompanied by armed guards and police, pursued by car loads of strikers. Customers closely followed by strikers' vehicles often panicked and resorted to dangerous traffic violations in their hegira and efforts to escape their pursuers. For example, customers would flee at speeds in excess of lawful limits and resorted to driving the wrong way on one way streets, oftentimes with their efforts unavailing. This extremely tense situation presented a real and present danger to the well being and safety of the direct participants in this labor dispute as well as innocent members of the community. It is within this context that the evidence relating to the specific episodes leading to the contempt citations must be viewed.

---

consistently engaged in by members of the Union in defiance of the order.

**4.** In addition to petitioners herein nine other individuals were served with notices of prosecution for contempt. These individuals, however, were acquitted.

**5.** This precarious situation was further exacerbated by the contemporaneous existence of a second and unrelated strike by another union against Anheuser-Busch directly. Numerous acts of violence and property damage were alleged to have been precipitated by this second dispute and directed at many of the same persons and businesses as the strike in this case.

Three specific instances of intimidation and harassment of plaintiffs' customers by individual petitioners, in addition to the promulgation of the following policy by the executive board of the Union, were cited in the trial court's finding of facts as the willful violations of the restraining order leading to the contempt convictions. In the first instance, petitioners Wray Hambrick, Jerry Becht, Michael Manion and Ronald McKenzie in concert with one another and other unnamed individuals were found to have "cause[d] two automobiles to be stopped in front of and in the path of a vehicle occupied by one Harrison Richards and one Charles M. Henkle, a customer of plaintiff Grey Eagle Distributing Company, and did obstruct and prevent the forward movement of said vehicle until said customer agreed to and did return to said plaintiff the beer he had just purchased and loaded upon his vehicle." The petitioners' conduct was found to have been done "wilfully and deliberately for the purpose of intimidating, coercing and harassing" plaintiff's customer.

Mr. Henkle, operator of Shirley's Package Liquor Store in St. Louis County, in an attempt to secure Anheuser-Busch products for his store, went to Grey Eagle on May 21, 1976 in a rented truck with his part-time employee, Harrison Richards. They crossed a picket line to enter Grey Eagle premises and did so without incident. After loading the truck with beer they left and proceeded up Millpark Avenue, the dead end street which serves as the only route of egress from Grey Eagle. Henkle and Harrison passed the pickets at the Grey Eagle gate, once again without incident. When they approached the stop sign at the corner of Millpark Avenue and Dorsett Road (approximately two blocks from the Grey Eagle facilities), two automobiles operated by unidentified persons pulled in front of them and blocked their path. A gaggle of ten to twelve strikers approached the truck, informed the occupants they had crossed their picket line and told them to "take the beer back" for a refund. The strikers' demand was tractably complied with and the beer was re-turned. When Henkle and Harrison departed again the strikers flagged them down at the same intersection and inspected the truck to confirm that all of the beer had been unloaded. No vehicles obstructed their path on this second occasion. There was no explicit oral threat of violence communicated in either incident, and the conversation between the parties was described as peaceful.

The testimony of petitioners regarding this incident was somewhat different. They maintain that no vehicles blocked Henkle's truck either time he left Grey Eagle. According to their testimony the sole reason that his truck came to a halt in their vicinity was the intersectional stop sign at Millpark and Dorsett. They say that three or four of them merely walked over to the truck once it had stopped and asked the gentlemen to return the beer after explaining the strike situation and its effect on their jobs. They deny that the parties were threatened or intimidated in any way to force compliance with their request. When the truck approached the intersection for the second time, according to petitioners, the driver stopped of his own volition. At this time the strikers offered to give Henkle $35 to reimburse him for the rental of his truck, but he refused to accept any money. Though the four petitioners convicted in connection with this incident deny any obstruction of the vehicle's path or any intimidation of its occupants, all admit being present at the scene.

The second incident leading to a contempt conviction involved a window breaking episode at the Westwood Grocery in Glendale. On April 30, 1976, Donald Hanneke, the operator of the grocery, after purchasing beer from Grey Eagle, was followed by unidentified strikers the entire route back to his store. On May 4, at approximately 11:30 p. m. bricks were thrown through the store's plate glass windows.

William Kratz, Jr., a neighbor living 150–200 feet from the store, heard the crash of shattering glass and immediately telephoned the Glendale police department. A

patrol car driven by Lieutenant J. M. Delling arrived thirty seconds to one minute later. In the meantime, Kratz observed a large vehicle speed away from the grocery. It was dark, however, and Kratz's view was partially obstructed by trees so the best description of the vehicle he could give police was that it resembled a light colored station wagon, van or camper. Kratz was still on the telephone with the police dispatcher when Lieutenant Delling's car arrived. He was able to alert the officer of the path the fleeing vehicle had taken. Lieutenant Delling pursued the vehicle some fifteen to thirty seconds behind.

According to Lieutenant Delling's testimony the dispatcher described the vehicle as being a light colored camper. After he had driven about two blocks from the grocery, he observed a vehicle fitting that description driving somewhat suspiciously as if it were lost. He stopped the vehicle and asked the two occupants for their identification. At this time he learned that the men were petitioners McKenzie and Woodson. Initially, they said that they were looking for a neighborhood tavern. Lieutenant Delling, however, noticed that McKenzie appeared visibly shaken and began to question him out of Woodson's hearing. When asked about throwing bricks, McKenzie, in something more than a lapus linguae, replied "F—— him. The son-of-a bitch crossed our line, and I want to protect my rights." Prior to this volunteered statement, Lieutenant Delling had not mentioned anything even remotely connected with beer deliveries, the beers strike, or, specifically, Hanneke's broken windows.[6] Nevertheless, McKenzie continued explaining, in Delling's words "that he was going to fight for his rights, that he had a family, that Mr. Hanneke had crossed their picket line."

Woodson made no statement, but both men were arrested for suspicion of burglary. Their jackets and shoes were confiscated and sent to the County Crime Laboratory for comparison with evidence found at the market. McKenzie's jacket was discovered to have mortar splatches on it.

Woodson and McKenzie denied breaking any windows and maintained that they had been looking for a tavern named Frank's Little Inn. However, except for the grocery, the area is completely residential, and there are no taverns in Glendale. They testified that they later learned the tavern they sought was located in Kirkwood, not Glendale. Moreover, McKenzie denied making any statement to police and explained that the mortar stain was on his jacket because he had helped Woodson lay bricks the previous weekend.

The final specific incident which the court found to violate its restraining order occurred on May 24, 1976, when petitioners Michael Manion and Ron Hosfeld in concert with others "did follow a truck operated by one Andy Garanella from Grey Eagle Distributing Company to Santoro's Restaurant located at Big Bend and Millbrook in University City, Missouri, over and along numerous public streets and did participate in the surrounding of said truck by vehicles operated and occupied by members of Local 133 while said truck was being operated in the public thoroughfares in such a manner that one striker's vehicle was immediately ahead of, one striker's vehicle immediately to the side of and two or more strikers' vehicles immediately to the rear of said truck, and that after said truck reached its destination as aforesaid, said defendants did remain conspicuously in the area where said truck was being unloaded." As with the previous three incidents the court found that the petitioners' actions violated that portion of the restraining order which forbade harassing, intimidating or coercing plaintiffs' customers.

Gerald Koester testified that he followed the truck operated by Andy Garanella from Grey Eagle to Santoro's and took photo-

---

6. Lieutenant Delling's first statement to McKenzie on stopping his vehicle was "[A]ren't you guys a little bit old to be throwing bricks?" He did not elaborate further on whose windows had been broken.

graphs of the vehicles pursuing Garanella.[7] Koester observed four to five vehicles which at various points along the route moved to the front, side and rear of Garanella's truck so that he was periodically surrounded on three sides by strikers' vehicles. Garanella did not testify, but the substance of what his testimony would be was entered into the record by stipulation. This stipulation largely corroborated Koester's testimony as to the existence of "bracketing"—bracketing being the act of surrounding a moving vehicle with other vehicles to control the pace and direction of movement of the bracketed vehicle. Additionally, it established that the followers' actions were perceived by Garanella to be harassing, intimidating and frightening. It was conceded, however, that no physical harm befell him as a result of this incident. During his testimony, Petitioner Girard, chief executive officer of the Union, acknowledged that bracketing would be wrong; that it could cause an accident.

Manion and Hosfeld admitted that they and others followed Garanella to Santoro's, but denied that they intentionally bracketed his vehicle or intended to harass or frighten him. They acknowledged, however, that along the route various strikers' vehicles may have been adjacent to or ahead of Garanella's truck through the normal course of driving. They further admitted remaining in Santoro's parking lot while the truck was being unloaded.

The final specification of contempt charged that petitioners, John Girard, John Taylor, Eugene Grossman, Charles Kelting, Louis Feldhaus and Dudley Alsop, as members of the Union's executive board, willfully violated that portion of the restraining order forbidding intimidation, harassment or coercion of plaintiffs' customers by adopting and promulgating the Union's policy of following customers from plaintiffs' places of business to their destinations.[8]

7. Gerald Koester is a professional photographer employed by plaintiffs to gather photographic evidence of the Union's violations of the restraining order.

8. In its Findings of Fact the court concluded the following:

"5. That the Executive Board of Local 133 thereupon adopted, promulgated and put into effect through the members of the Union a policy and practice of having each such customer who picked up beer followed to his destination, ostensibly for the purpose of identifying such customer and later publishing in a labor newspaper the fact that such customer had crossed a picket line and was 'unfair' to labor.

"6. That this policy and practice was, with the knowledge and direction of the chief executive officer and the members of the Executive Board of the Union, carried out by means of a gathering of large numbers of strikers near, but not at, the respective entrances to plaintiffs' warehouses with numerous and varied vehicles which pursued each customer as he left plaintiffs' premises; this 'following' in most instances was performed by several vehicles (as many as five in at least one case), each usually occupied by more than one striker, and in a very ostentatious and conspicuous manner.

"7. That prior to and after the issuance of the Restraining Orders, certain of the customers *so followed sustained acts of vandalism,* such as broken windows, concrete poured into restroom urinals, or shattered windshields.

"8. That customers of other beer distributors who also sold from their warehouses were shot at and suffered bricks and rocks thrown at their vehicles while transporting beer.

"9. That such incidents, as well as numerous other acts of vandalism directed toward customers of beer distributors, received widespread publication by the news media and became a subject of public knowledge as well as a frequent topic of conversation among customers of plaintiffs.

"10. That by reason of the foregoing, certain customers of plaintiffs began hiring guards and carrying firearms while transporting beer and a potential for physical violence was created in addition to the existence of a fear of vandalism and property damage.

"11. That this atmosphere of fear and terror permeated the entire beer distribution industry of the St. Louis Metropolitan area and was known to the chief executive officer and Executive Board of Local 133. The Court finds the testimony of Board members that they had not heard of any damage to the property of any of plaintiffs' customers unworthy of belief.

"12. That notwithstanding all of the above, subsequent to the issuance of the Restraining Orders herein, the chief executive officer and the Executive Board of Local 133 directed the members of the Union to continue the practice of 'following' in the same manner as before and that such directions have been carried out by the members of the Union.

"13. That after June 3, 1976, the date upon which three days of testimony ended and this Court issued its Order to certain defendants to show cause why they should not be held in

The court found that this policy, which was admittedly conspicuously engaged in, because of the widespread public knowledge of the acts of vandalism and violence it precipitated was intended to cause and did cause fear to customers in direct violation of the restraining order.

Petitioners admit that the practice of following was engaged in; that the executive board adopted this practice as the Union's policy and that the executive board, under its cachet, encouraged participation in the practice by its members. It is their contention, however, that the policy served a legitimate labor dispute function in that it gave the Union a means to learn the identity of those persons who crossed their picket line to buy beer from the struck employers. In this connection they argue that following customers was a long standing policy of

Local 133, as well as other local unions, and had been used in previous strikes where struck employers had sold their products directly from the docks. They maintain that the policy was employed to serve two valid purposes. First, it was to procure the names and license numbers of the customers for later publication in the Union newspaper "unfair list." This list was used to alert other union members that the persons and businesses whose names appeared thereon had crossed a picket line and were to be boycotted because they were unfair to organized labor. Secondly, the Union maintained that it was used to discover and to expose those customers who engaged in the illegal practice of "bootlegging" beer. Union members testified that on occasion customers holding valid retail liquor licenses would purchase truck loads of beer from the wholesalers and then would deliver this

contempt, said chief executive officer and the Executive Board of Local 133 directed that the 'following' policy be 'minimized,' i. e. to follow some but not all customers and to follow some only part of the way to their destination just to let them know they are being followed.' This direction being given after the chief executive officer and the President of Local 133 had both spent three days in the Courtroom listening to the testimony of numerous customers of plaintiffs to the effect that being followed caused them to be frightened and amounted to intimidation and harassment.

"14. That the practice of following customers in the manner in which it was conducted by members of Local 133, i. e. by numerous vehicles occupied by numbers of strikers, in some instances swerving in front of the customer and coming to a sudden stop, in other instances surrounding the customer by strikers' vehicles in front, on the side and behind him, by following vehicles which have displayed thereon the name and address of the customers, by remaining at the customer's destination and conspicuously watching the unloading of beer, by the failure to inform the customers of the claimed purpose of the following, was deliberately and willfully intended by the chief executive officer and the Executive Board to harass, intimidate and coerce customers of plaintiffs in direct violation of the Restraining Orders issued herein.

"15. That said practice of following in such manner conducted and continued in the aforementioned atmosphere of fear and terror did indeed accomplish its intended purpose of harassing, intimidating and coercing plaintiffs' customers.

"16. That notwithstanding the absence of proof regarding the actual identity of the perpe-

trators of most of the vandalism mentioned in the evidence, it was the intention of the chief executive officer and the Executive Board of Local 133 to take advantage of the fear engendered thereby in directing the continuation of such practice after the issuance of the Restraining Orders herein for the purpose of harassing, intimidating and coercing plaintiffs' customers in direct violation of said Order.

"17. That the manner in which such following was conducted as described in paragraph 14 hereof, belies the stated purpose thereof, viz. to identify the customer for purposes of publishing his name and also belies the testimony of the chief executive officer that said policy and practice was not intended to violate the Restraining Orders.

"18. That the chief executive officer and the Executive Board of Local 133 willfully and with calculated deliberation adopted and continued in effect the practice and policy of following in the manner described for the purpose of harassing, intimidating and coercing plaintiffs' customers as prohibited by the Restraining Orders by means of a procedure which would seem legitimate were it not for the atmosphere of fear and the excesses of the following practices set forth above, and if conducted in such a manner as to limit its effect to its stated purpose of identifying customers.

"19. That the acts and conduct of the chief executive officer and the Executive Board hereinabove described were done willfully and deliberately for the purpose and with the intent of thwarting and defeating the Restraining Orders of April 22, 1976 and April 28, 1976 and constitute contempt against the majesty of the law and the authority and dignity of the Circuit Court of the City of St. Louis."

beer to more timorous establishments, some of which the Union contended did not have valid retail licenses. It was purportedly to prevent this illegal practice that the Union members followed customers all of the way to their businesses and watched them unload their beer even when they knew the name and address of the customer beforehand. There was but one hearsay incident of purported "bootlegging" reported.

Petitioners testified repeatedly that in adopting and implementing the policy of following, violence of every kind was expressly prohibited. Nonetheless, there were frequent episodes of dangerous and violent conduct accompanying instances of following both before and, to a lesser extent, after the restraining orders were issued. One customer, testified that on two occasions prior to the restraining orders and once after their issuance he was followed from Lohr's by three or four carloads of strikers. While operating on public streets they would maneuver their vehicles in front of his trucks and at times drive at speeds of less than five miles per hour. At other intervals along the route they would jam on their brakes or come to complete halt in traffic lanes in an effort to bring about collisions between their vehicles and the beer trucks. In addition, the trucks were intermittently bombarded with rocks and ball bearings; roofing nails were strewn on the roadway. Because of these and similar acts of violence occurring during the following and because acts of vandalism occurring shortly thereafter, customers testified that they felt intimidated by and were fearful of the following even when it was ostensibly peaceful.[9]

It is the Union's position that the policy of following as adopted was not in violation of the terms of the restraining order. In fact, on the advice of counsel to that effect,

the policy was continued even after Judge Gaertner found probable cause to believe that the policy violated the restraining order and warned petitioners that "any continuation of said practice during the period preceeding the final determination of this matter will be conducted at the peril of the defendants."[10]

On June 24, 1976, Judge Gaertner found petitioners guilty of criminal contempt for the violations previously described and imposed punishment as follows:

| Contemnor | Case No. | Confinement | Fine |
|---|---|---|---|
| John J. Girard | 38271 | forty days | $10,000 |
| John E. Taylor | 38272 | forty days | 10,000 |
| Eugene P. Grossman | 38275 | ten days | 2,500 |
| Charles E. Kelting | 38274 | ten days | 2,500 |
| Louis H. Feldhaus | 38273 | ten days | 2,500 |
| Dudley Alsop | 38276 | ten days | 2,500 |
| Ronald McKenzie | | | |
| under paragraph 4 of Court Order | 38277 | thirty days | 2,500 |
| under paragraph 5 of Court Order | 38841 | none | 2,500 |
| Robert Woodson | 38278 | thirty days | 2,500 |
| Wray Hambrick | 38838 | none | 2,500 |
| Jerry Becht | 38837 | none | 2,500 |
| Michael Manion | | | |
| under paragraph 5 of Court Order | 38840 | none | 2,500 |
| under paragraph 6 of Court Order | 38840 | none | 2,500 |
| Ron Hosfeld | 38839 | none | 2,500 |

Those petitioners who were sentenced to jail terms immediately filed petitions for writs of habeas corpus with this court. Preliminary writs were granted on June 25, 1976, and petitioners were freed on bond pending oral argument and final judgment.

On December 28, 1976 those petitioners who received fines, after admitting their ability to pay, refused to do so in open court.[11] Their purpose in doing so was to test the court's original finding of contempt by way of this habeas corpus proceeding. After each was sentenced to jail pending payment of the fine, preliminary writs were sought and granted for those petitioners as well.

9. Most customers admitted that the strikers made no express threats against them in the course of following. This testimony supports the executive board's contention that the official policy of the Union was to forbid violence and was engaged in to accomplish the purposes previously stated.

10. After this warning on June 3, 1976, the executive board voted to continue the policy of following, but decided to employ it on a random basis and then only for short distances in order to learn the customer's identity.

11. The Union agreed to pay petitioners' fines for them.

Petitioners attack their convictions on three separate bases. First, they contend that the State court was without jurisdiction to regulate the Union's strike policy by means of a restraining order because of preemption by federal labor law. Secondly, they contend that the restraining orders were so vague that they were not apprised in advance of what conduct violated its terms. Finally, they contend there was insufficient evidence to support their convictions.

Before reaching these contentions, it is first necessary to indite the fundamental precepts of the law of contempt which bear on the denouement of this decision. Constitutional courts of common law jurisdiction have both a statutory and an inherent power to punish persons guilty of willful disobedience of their lawful orders. Section 476.110 RSMo.1969; *Osborne v. Purdome*, 224 S.W.2d 1005 (Mo.banc 1951); cert. denied, 343 U.S. 953, 72 S.Ct. 1046, 96 L.Ed. 1354 (1952); *State on Inf. of McKittrick v. Koon*, 356 Mo. 284, 201 S.W.2d 446 (banc 1947); *Chemical Fireproofing Corp. v. Bronska*, 553 S.W.2d 710 (Mo.App.1977); *Houston v. Hennessey*, 534 S.W.2d 52 (Mo.App.1975). While the primary purpose of civil contempt is to protect the parties to the litigation for whose benefit the order was issued, the primary purpose of criminal contempt is to protect, preserve and vindicate the power and the dignity of the law itself. *Teefey v. Teefey*, 533 S.W.2d 563 (Mo.banc 1976). If courts could not punish those who treat with insolence their lawful orders, the judicial system would be rendered ineffective and would lose the faith of the people as the preferred means of resolving their disputes. Judgments could be accepted or rejected at whim with impunity and would be essentially advisory in nature, *Chemical Fireproofing Corp. v. Bronska*, supra, resulting in a discomfiture of the judicial process.

Petitioners herein are convicted of indirect or constructive criminal contempt, meaning that it arose out of matters occurring outside of the presence of the court [12] but which nonetheless tended to belittle, obstruct or prevent the administration of justice. Unlike direct contempt, which may be punished summarily, one charged with indirect contempt is entitled to reasonable notice of the charges against him and to a hearing on those charges. *Mechanic v. Gruensfelder*, 461 S.W.2d 298 (Mo.App.1970); *Curtis v. Tozer*, 374 S.W.2d 557 (Mo.App. 1964); *G. v. Souder*, 305 S.W.2d 883 (Mo. App.1957). The alleged contemnor is afforded many of the protections of a criminal defendant though a contempt proceeding is not strictly speaking criminal, but, rather, is sui generis. *Osborne v. Purdome*, supra. The State, nevertheless, has the burden of proving the elements of criminal contempt beyond a reasonable doubt just as in a criminal prosecution. *State ex rel. Wendt v. Journey*, 492 S.W.2d 861 (Mo.App. 1973); *Ex Parte Miles*, 406°S.W.2d 107 (Mo. App.1966). The elements are actual knowledge of the restraining order [13] and willful conduct in violation of its terms. *Chemical Fireproofing Corp. v. Bronska*, supra; *Mechanic v. Gruensfelder*, supra. The scienter requirement of the second element is traditionally the most difficult to establish, but its proof is essential, as the existence of contempt is measured largely by the intent with which the contested conduct was committed. Where there is no intent to defy and degrade the order of the court, there is no contempt even in the face of seemingly contumacious conduct. *McMullin v. Sulgrove*, 459 S.W.2d 383 (Mo.banc 1970); *State v. Koon*, supra; *State ex rel. Wendt v. Journey*, supra.

Once the court has found an individual in contempt there is no right of appeal though the validity of the judgment may be challenged in a habeas corpus proceeding. *Curtis v. Tozer*, supra. It is the

---

12. For an in depth analysis of the various forms and categories of contempt, see *Ex Parte Clark*, 208 Mo. 121, 106 S.W. 990 (1907); *Chemical Fireproofing Corp. v. Bronska*, supra.

13. Petitioners admitted in their answer to the initial complaint that they had notice of the restraining order; therefore sufficient proof of this element is not in question.

habeas court's duty to review the evidence against each petitioner and determine "whether that evidence supports the finding, beyond a reasonable doubt, that the petitioner acted as stated in the specifications found as to him or her. In so doing it is unnecessary to consider all the specifications found as to that petitioner. The purpose of the writ is to test the legality of the restraint. It follows that if the determination stated above is supported as to even one of the several specifications contained in the judgment entered as to a petitioner, then that petitioner is not illegally restrained and, as to that individual, our writ should be quashed. On the other hand, if not even one of the several specifications found as to a petitioner is sustained, beyond a reasonable doubt, by the evidence then the petitioner must be discharged." *Curtis v. Tozer,* supra at 581.

In a habeas proceeding challenging the sufficiency of the evidence, we do not review the record de novo, but are limited to a determination of whether the trial court's findings are supported by the evidence. *Ex Parte Neal,* 507 S.W.2d 674 (Mo.App.1974). In making that determination, we must accept the evidence along with all favorable inferences which reasonably may be drawn therefrom in the light most favorable to the court's judgment. All facts and inferences to the contrary are to be disregarded. *State v. Franco,* 544 S.W.2d 533 (Mo.banc 1976). It is not the habeas court's function to weigh the evidence where it is in conflict or to resolve issues of credibility; we look only to see if there was substantial evidentiary support for the court's finding.

Furthermore, criminal contempt may be proved by circumstantial evidence so long as the facts are consistent with one another and the hypothesis of guilt and inconsistent with a reasonable hypothesis of innocence. *Mechanic v. Gruensfelder,* supra; *Ex Parte Miles,* supra. Mere presence by a petitioner when conduct in violation of a court order occurred or mere opportunity to engage in the conduct is insufficient to support a conviction for contempt. *State v.*

*Castaldi,* 386 S.W.2d 392 (Mo.1965). Nevertheless, proof of participation in forbidden activity may rest upon accumulated interdependent facts, no one of which creates more than a suspicion of guilt. *State v. Jackson,* 519 S.W.2d 551 (Mo.App.1975). Where there is concerted group action, as here, it is important to remember that any affirmative participation as a member of a group in activity which violates the court order will subject each participant to contempt liability so long as he acts with the requisite knowledge and intent. See *State v. Reynolds,* 521 S.W.2d 486 (Mo.App.1975). It is no defense that the individual participant's conduct, when isolated from that of the group as a whole, would not violate the court's order. The foregoing applies with equal weight to those who direct, control, plan and supervise activity in defiance of the court order. The true instigators may not be absolved by maintaining the appearance of remaining above the fray. One who conspires to induce contemptuous conduct by others which does in fact occur may be equally guilty with those who actually engage in that conduct. *Curtis v. Tozer,* supra.

Turning specifically to petitioners' contentions, we will deal with the vagueness claim first. To comport with fundamental principles of fairness, it is essential that the restraining order fairly and precisely advise the individual of what conduct is forbidden. To support a charge of contempt for its disobedience, "an order will not be expanded by implication in the contempt proceeding but must be so specific and definite as to leave no reasonable basis for doubt as to its meaning." *G. v. Souder,* supra at 885. See also *State ex rel. City of Pacific v. Buford,* 534 S.W.2d 819 (Mo.App. 1976); *Gerard v. Kodner,* 468 S.W.2d 677 (Mo.App.1971). Where one has a genuine doubt as to whether his proposed conduct would be violative of the order because of its alleged vagueness, the proper procedure is not to act in reckless disregard of the potential restraint imposed. Once a court of general jurisdiction, having equity powers, issues an order upon pleadings properly

before it, the order must be scrupulously obeyed even though it may prove to be erroneous. It is the function of the court in the first instance to judge the legality of its decision and until that decision is modified or reversed it must be respected under pain of contempt. Any attack on the propriety of the order must be by judicial process and not willful disobedience. *Maness v. Meyers,* 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1976); *Houston v. Hennessey,* supra. "No man may judge his own case. If one man may determine the law of his own case, all men may do so. If parties make themselves the judge of the validity of a court order regularly entered respecting their conduct or cause of action, then the courts become impotent and judicial power becomes a mockery. (citations omitted) Until the judgment of a court is set aside by such court upon reconsideration, or is reversed for error upon orderly procedure, its orders must be respected by full obedience. Disobedience of such orders is contempt of its lawful authority and punishable as such." *State v. Koon,* supra at 455. Thus, a contempt conviction may not be attacked on the grounds of vagueness of the order where contemnors have, as here, engaged in conduct clearly proscribed thereby. *Mechanic v. Gruensfelder,* supra.

■ Petitioner's allegations regarding the insufficiency of the evidence to support their convictions are likewise without merit. In the truck obstruction incident, the court found that petitioners Hambrick, Becht, Manion and McKenzie acted in concert with others to cause automobiles to block the path of a truck occupied by Charles Henkle, a Grey Eagle customer, and to obstruct its forward movement until Henkle agreed to return the beer he had just purchased. There was some evidence from which the court could reasonably conclude that these petitioners caused the automobiles to block Henkle's path. But more important, there was sufficient evidence to establish that they participated in the obstruction of the vehicle once halted. Each admitted being in the group of ten to twelve strikers who approached the truck and demanded that the beer be returned. Under these circumstances and within the context of this violent strike, the court could find that these actions constituted obstruction "done willfully and deliberately for the purpose of intimidating coercing and harassing a customer" of Grey Eagle in violation of the restraining order. When a small crowd of people descends upon a vehicle it caused to be blockaded and makes demands upon the occupants to engage in conduct contrary to their previous intention, the court could find inherent intimidation, harassment and coercion. The mob manner in which these men conducted themselves belies their stated informational purpose. If one or two of the strikers had approached Henkle's truck to explain the Union's position we would have difficulty finding a violation of the order, but the methods employed here, as corroborated by photographic evidence, were patently contrary to its terms. One of the court's specifications of contempt being sufficiently established, the conviction will stand.

■ Likewise, the conviction of petitioner McKenzie in the window breaking incident, though based entirely on circumstantial evidence, is supported by the evidence. There is no question that this destructive conduct violated the terms of the restraining order. The only real issue here is whether there was sufficient proof that McKenzie was responsible for the damage. We believe there was. The testimony of Winston Kratz, Jr. that the vehicle involved was similar to that in which McKenzie and Woodson were discovered, the close proximity in time and distance to the scene of the crime, as well as the unsolicited explanation of the motive for the window breaking by McKenzie showing his guilty knowledge of the crime established sufficient, cumulative interdependent facts to sustain McKenzie's conviction. However, the case against petitioner Woodson rests only on his presence with McKenzie at the time their camper was halted. We find the evidence against Woodson insufficient to support his conviction for contempt, as it is not inconsistent

with a reasonable hypothesis of innocence. *State v. Castaldi,* supra.

■ The convictions of petitioners Manion and Hosfeld for bracketing Andy Garanella's truck in traffic are substantially supported by the evidence. The testimony contained in Garanella's stipulation that at least three car loads of strikers followed him from Grey Eagle and at various times positioned themselves on the front, side and rear of his vehicle so that he was completely surrounded was corroborated by the testimony of Gerald Koester. Petitioners admit their presence and that the events described may have occurred en route, but deny intimidation. We believe that given the evidence of previous incidents of violence accompanying the following of plaintiffs' customers' vehicles and petitioner Girard's statement that bracketing would be wrong, the court could reasonably find that such action was deliberately undertaken for the purpose of intimidating and harassing Garanella in violation of the restraining order. In this instance, as in the truck stopping episode, the Union's method of procedure negates its stated purpose and bolsters the court's conclusion. The strikers' mass action of bracketing could have no legitimate lawful purpose. It invited evasion tactics and retaliation by Garanella because of the fear it engendered in him. As such, it posed a grave potential for harm to Garanella as well as all other members of the public travelling on the same streets. The evidence is sufficient to support these convictions.

Finally, we reach the convictions of the members of the Union's executive board for adopting and promulgating the policy of following plaintiffs' customers. Petitioners admit adopting said policy and disseminating it to their members for implementation. They argue, however, that the court was without jurisdiction to prohibit such practice because it was preempted by federal labor law; furthermore, that the policy, as adopted, did not violate the literal terms of the restraining order.

■ It is true that one may not be held in contempt for violation of an order the court was without jurisdiction to issue. *Ex Parte Irwin,* 6 S.W.2d 597 (Mo.banc 1928); *State ex rel. Hyde v. Westhues,* 316 Mo. 457, 290 S.W. 443 (banc 1927). The court here, however, had jurisdiction to issue this order. Any aspect of a labor dispute which is arguably a protected activity under § 7 or an unfair labor practice under § 8 of the National Labor Relations Act may not be directly regulated by state courts because of federal preemption, *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). See generally Cox, *Labor Law Preemption Revisited,* 85 Har.L.Rev.1337 (1972). But the power of state courts to enjoin violence and preserve the peace as well as to prohibit other actions deemed detrimental to the public health and safety has not been precluded even when an incidental effect is to regulate the parties to a bonafide labor dispute. *Automobile Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); *Garner v. Teamsters, Chauffeurs and Helpers Local 776,* 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953); *Tallman Co. v. Latal,* 365 Mo. 552, 284 S.W.2d 547 (banc 1955), "Nothing in the federal labor statutes protects or immunizes from state action violence or the threat of violence in a labor dispute." *Farmer v. Local 25,* 430 U.S. 290, 299, 97 S.Ct. 1056, 1063, 51 L.Ed.2d 338, 349, 350 (1977). Furthermore, a state may even enjoin peaceful labor activity, such as picketing and patrolling, when they are so enmeshed with contemporaneously violent and illegal conduct as to be part of a pattern of violence and fear. *Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc.,* 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836 (1941).[14] A state may "protect its storekeepers from being coerced by fear of window smashings or burnings or bombings. And acts which in isolation are peaceful may be part of a coercive thrust when entangled with acts of violence. The picketing in this case was set in a background

---

14. The continuing validity of the *Meadowmoor Dairies* doctrine was reaffirmed in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful." *Id.* at 294, 61 S.Ct. at 555. The court was not required by federal labor law to sit inactive atop this powder keg waiting for it to fulminate. We believe that its order did no more than restrain future acts of violence and other activities which were designed to nourish the "momentum of fear generated by past violence"; therefore, the order issued was within its subject matter jurisdiction. See *Youngdahl v. Rainfair, Inc.,* 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957).

■ Finally, we conclude that the practice of following violated the terms of the restraining order. There was abundant evidence of violence accompanying following episodes both before and after issuance of the restraining order. It was obvious from the testimony, and was manifested to petitioners by their conduct when subjected to it, that the customers were uniformly frightened and intimidated by the Union's program of following. While it is true that the court did not specifically forbid following, it did forbid intimidation, harassment, and coercion of customers. The meaning of these terms is clear to one acting in good faith. The court was not required to denominate every type of prohibited conduct which would intimidate, harass and coerce customers. Use of generic terms was sufficient to give petitioners fair warning. If they questioned the permissibility of this practice, the proper course was a motion to modify the order, not reckless disobedience of its literal terms. The fact that the policy was designed in the abstract to be non-violent is irrelevant. Violence and fear of violence did occur as a direct result of this policy and the petitioners' testimony that they were unaware of that fact is unworthy of belief. Nor is it relevant that the executive board members, themselves, did not engage in following. Those who direct and control the implementation of contemptuous activity so as to cause members of their organization to violate a court order may not evade a contempt citation by the circuity of their involvement. The role played by the members of the executive board in adopting and continuing the policy of following with full knowledge of the intimidation and violence it engendered is analogous to that of the leaders of the demonstration in *Curtis v. Tozer,* supra, who were held guilty of criminal contempt. Though the evidence did not support a finding that the leaders, themselves, had engaged in conduct directly violative of the literal terms of the restraining order, the court found that they had "directed, controlled, supervised and planned the demonstration, while the restraining order was in force so as to cause members of their organization and others to violate the restraining order . . . [T]hese petitioners were found to have aided, abetted and counseled others to engage in the described activities violating the restraining order. There can be no doubt that such activities are punishable for contempt." *Id.* at 581–582. The members of the executive board were the deliberate instigators of acts of contempt and may be punished as such; the punishment meted out by the trial court was condign.

We find that all petitioners, except Robert Woodson, are not illegally restrained; that our writs as to all such petitioners should be quashed; that such petitioners be remanded to the custody of the respondent. As to Robert Woodson, we hold that he is illegally restrained, in that the evidence does not support a finding of guilty beyond a reasonable doubt of the specifications found in the judgment entered against him. Accordingly, Robert Woodson is to be discharged.

KELLY, P. J., and WEIER, J., concur.