Ex parte David **RAMSEY** et al., Petitioners,

v.

Derek **GRAYLAND, etc., Respondent.**

No. 39595.

Missouri Court of Appeals,
St. Louis District,
Division 2.

May 2, 1978.

Motion for Rehearing and/or Transfer
Denied June 8, 1978.

Ruppert & Schlueter, Francis L. Ruppert, Joseph Westhus, Clayton, for appellants.

Andrew Minardi, Assoc. County Counselor, Clayton, Bryan A. Roche, Hussmann Refrigerator, Bridgeton, for respondent.

1. The court found that both Ramsey and Stone picketed the property of Hussmann at a time when two persons were already picketing at or near the entrance; did with others block egress and ingress to the property; did seek to coerce or intimidate employees of plaintiff from entering or leaving property by shouting "go home scabs", and did assemble, group, loiter, stand, congregate, convene, gather, muster, meet, mass, throng, crowd, rally and collect in a crowd of 300 to 400 persons within 100 yards of plaintiff's boundaries. The court found that Stone brought a bullhorn for use in organizing a mass picket line at or near the entrance to

## PER CURIAM.

Petitioners, David Thomas Ramsey and Janet Elise Stone, contest their convictions for criminal contempt in this original habeas corpus proceeding. The convictions are based on the findings of Circuit Judge Robert Lee Campbell that petitioners willfully and deliberately violated a valid restraining order issued by him.[1] Ramsey was sentenced to five months imprisonment; Stone, sixty days.

The conduct for which petitioners were found to be in violation of the restraining order occurred in conjunction with a strike by members of Local 13889, United Steelworkers of America, AFL–CIO, against Hussmann Refrigerator Co. Neither petitioner is a Hussmann employee or a member of the union local, but both are participants in a local effort to organize a so-called National Workers Organization.

On May 4, 1977, the circuit court issued its original restraining order in response to a Petition for Injunction filed that date by Hussmann. The court order limited to two (2) the number of persons allowed to picket at each gate leading to the Hussmann plant, and ordered defendants[2] to desist and refrain from:

1. . . . [B]locking or attempting to block in any manner any of the driveways to said Hussmann Refrigerator Co.'s property or from blocking or attempting to block in any manner egress and ingress to said property.

2. Seeking to coerce or intimidate by physical acts or words, plaintiff's em-

Hussmann in support of the strike. The court found that Ramsey led the crowd in a picket line and demonstration and stated over a public address system: "We all came together, we will leave together", and further, "We'll fight the courts, we'll fight Hussmann, we'll fight the police", and "Come on, let's get organized."

2. Petitioners were not named defendants. The named defendants included United Steelworkers of America, AFL–CIO, Local 13889, several of its officers and officials, members of the union bargaining committee, and several union members.

ployees, customers and persons making deliveries or pickups to or from said property from entering or leaving said property and transacting business with Hussmann Refrigerator Co.

3. Damaging in any way any property of Hussmann Refrigerator Co. or property of any person lawfully present at or near Hussmann Refrigerator Co.'s said property.

On May 24, 1977, the temporary restraining order was continued for sixty days by consent of the attorneys for defendants. On June 5, 1977, Judge Campbell visited the Hussmann premises and personally observed numerous violations of the restraining order. A Motion to Expand Temporary Restraining Order was filed on June 6, alleging that on numerous occasions, several dozen individuals had continued to picket in violation of the order, and further alleging numerous acts of violence on June 6, 1977. An amended order was issued that date. In addition to the terms of the previous order, the amended order instructed "defendants and *all others*" (emphasis added) to desist and refrain from:

4. Assembling, grouping, loitering, standing, congregating, convening, gathering, mustering, meeting, massing, thronging, crowding, rallying or collecting of any person or persons within one-hundred (100) yards of plaintiff's chain link metal fence which extends along the boundaries of plaintiff's property adjacent to Taussig Road, Enterprise Way and St. Charles Rock Road, in the City of Bridgeton, St. Louis County, Missouri.

The amended order was personally read by the Judge to a group assembled near the Hussmann premises on June 6. On July 25, 1977, the amended restraining order was continued on the court's own motion to September 8, 1977. On July 25, the court also issued a temporary restraining order against Hussmann, its agents and employees, ordering them to refrain from driving through gates where lawful pickets were located and to refrain from coercing or intimidating lawfully-present picketers.[3]

The events which formed the basis of the contempt prosecutions occurred in the early morning of August 1, 1977. 300–400 people gathered within 100 yards of Hussmann's chain link fence in what appears to have been a loosely organized demonstration against the company and its non-union employees. Evidence of petitioners' involvement in the demonstration was adduced from their own testimony as well as that of several police officers and company employees. Ramsey carried a bullhorn, supplied by Stone, and shouted instructions to the crowd to gather in a circle. One police officer testified: "He was chanting. He was talking to the group trying to get the group to stay there to march around in a circle. [He shouted:] 'Scabs go home . . [W]e will fight the courts, we will fight Hussmann, we will fight the police.'"

Lieutenant Eugene Hoff of the Bridgeton Police Department arrived between 6:30 and 6:45 a. m., parked his car inside gate # 1 on the Hussmann lot and faced the crowd assembled outside the fence on Taussig Road. On two or three occasions, he read the amended restraining order over the public address system attached to his car and ordered the crowd to disperse. Ramsey and Stone both testified that the noise from the crowd prevented their hearing Lieutenant Hoff, although they both heard amplified sounds from the direction of the Hussmann plant and Stone admitted hearing the words, "You are in violation . . . ."

Officer John F. Julian of the Missouri Highway Patrol and Officer William Hencken of the St. Louis County Police both testified the assembly was very loud, and at times unruly. Several rocks and bottles were thrown. The officers stood within 10–20 feet of petitioner Ramsey and observed him, bullhorn in hand, shouting instructions to the crowd and chanting,

---

3. At each step of the proceeding, the union local and all named defendants were represented by counsel, and no order issued outside the presence of defendants' attorneys. Indeed, the attorneys for defendants consented to the first continuance of the temporary restraining order.

"Scabs go home, scabs go home." Officer Hencken also observed petitioner Stone standing approximately five feet from Ramsey. Both witnesses, though standing in close proximity to the crowd and the petitioners, heard the court order as it was being read over the loudspeaker. Petitioners continued their activities and remained within the 100 yard restricted area after the amended order had been read and they had been warned that they were in violation of the court order and would be arrested if they did not disperse.

Petitioners and other demonstrators were arrested, taken to Bridgeton Police Headquarters, and released the same day. Upon their release, each was given a small piece of paper which indicated they were to appear before Judge Campbell on August 8, 1977. However, on August 4, 1977, in response to a Motion to Cite for Contempt, a Show Cause Order was issued compelling their appearance in the Circuit Court at 10:30 a. m. on August 15, 1977. The record indicates Ramsey was served on either the 5th or 6th of August and Stone was served on either the 8th or 10th. Trial of petitioners began at 4:15 p. m. on August 15, ran through the 16th and was completed at 4:45 p. m. on August 17.

▮ Petitioners challenge their conviction on numerous grounds, but before reaching these contentions, we think it is appropriate to review the fundamental precepts which underlie the law of contempt. Constitutional courts of common law jurisdiction have both statutory and inherent power to punish persons guilty of willful disobedience of their lawful orders. Section 476.110, RSMo. 1969; *Osborne v. Purdome*, 244 S.W.2d 1005 (Mo. banc 1951) *cert. den.*, 343 U.S. 953, 72 S.Ct. 1046, 96 L.Ed. 1354 (1952); *State ex rel. Girard v. Percich*, 557 S.W.2d 25 (Mo.App.1977);[4] *Houston v. Hennessey*, 534 S.W.2d 52 (Mo.App.1975). Whereas the primary purpose of civil contempt is to protect the parties to the litiga-

tion for whose benefit an order was issued, the primary purpose of criminal contempt is to protect, preserve and vindicate the authority of our courts and the power and the dignity of the law itself. *Teefey v. Teefey*, 533 S.W.2d 563 (Mo. banc 1976); *State ex rel. Girard v. Percich, supra.* "If courts could not punish those who treat with insolence their lawful orders, the judicial system would be rendered ineffective and would lose the faith of the people as the preferred means of resolving their disputes. Judgments could be accepted or rejected at whim with impunity and would be essentially advisory in nature . . . ." *State ex rel. Girard v. Percich, supra* at 36.

▮ Petitioners herein were convicted of indirect criminal contempt for conduct occurring outside the presence of the court. Unlike direct contempt, which may be punished summarily, one charged with indirect contempt is entitled to reasonable notice of the charges against him and to a hearing on those charges. *Mechanic v. Gruensfelder*, 461 S.W.2d 298 (Mo.App.1970). The criminal contempt is not, strictly speaking, a criminal proceeding, but rather is sui generis. *Osborne v. Purdome, supra.* Nonetheless, as in a criminal prosecution, the State has the burden of proving the elements of criminal contempt beyond a reasonable doubt. *State ex rel. Wendt v. Journey*, 492 S.W.2d 861 (Mo.App.1973). Actual knowledge of the restraining order and willful conduct in violation of its terms are the elements that must be proved. *Chemical Fireproofing Corp. v. Bronska*, 553 S.W.2d 710 (Mo.App.1977); *Mechanic v. Gruensfelder, supra.*

▮ There is no right of appeal from a judgment of contempt, though the validity of the judgment may be challenged in a habeas corpus proceeding. *Curtis v. Tozer*, 374 S.W.2d 557 (Mo.App.1964). The duty of the court in such a proceeding is to review the evidence against the petitioner and to determine:

---

**4.** On April 13, 1978, the United States Court of Appeals for the 8th Circuit ruled in *Girard v. Goins*, 575 F.2d 160. This case involved the same petitioners who sought habeas corpus

relief in *State ex rel. Girard v. Percich, supra.* However, the principles for which we cite *Girard* were not affected by the 8th Circuit.

. . . whether that evidence supports the finding, beyond a reasonable doubt, that the petitioner acted as stated in the specifications found as to him or her. In so doing it is unnecessary to consider all the specifications found as to that petitioner. The purpose of the writ is to test the legality of the restraint. It follows that if the determination . . . is supported as to even one of the several specifications contained in the judgment . . . then that petitioner is not illegally restrained . . .. On the other hand, if not even one of the several specifications . . . is sustained, beyond a reasonable doubt, by the evidence then petitioner must be discharged.

*Curtis v. Tozer, supra* at 581.

We turn now to the specific contentions raised in this proceeding. First, petitioners argue the judgment of contempt is void because it failed to recite the particular facts supporting the contempt order. It is a long-established rule that in contempt proceedings the facts and circumstances constituting the offense, not mere legal conclusions, must be recited in both the judgment of contempt and in the order of commitment. *Ex Parte Brown*, 530 S.W.2d 228, 230 (Mo. banc 1975); *In Re Randolph*, 474 S.W.2d 36, 39 (Mo.App.1971); § 476.140, RSMo 1969; Rule 35.01. Our review of the record indicates this requirement was met. At the close of the evidence, the court found both petitioners in contempt of court; and as to petitioner Ramsey, the court read into the record the Warrant and Order of Commitment, containing the court's Findings of Fact, Conclusions of Law, Judgment and Sentence. The same day, the court separately issued, as to each petitioner, its Findings of Fact, Conclusions of Law, and Judgment, and a Warrant and Order of Commitment. The documents, while bearing different headings, were virtually identical inasmuch as the Warrant and Order of Commitment incorporated the court's Findings of Fact,

Conclusions of Law, and Judgment. Both the "Findings" and "Warrant" stated with requisite particularity and detail the facts and circumstances constituting the offense. Petitioners' argument to the contrary is clearly without substance.[5]

As further grounds for vacating the judgment, petitioners contend they were denied a fair and impartial hearing owing to the alleged bias of the trial judge. They cite the following conduct as indicative of the appearance of bias or the likelihood of bias. First, the trial judge had a thorough knowledge of the events surrounding the case prior to trial. He personally visited the Hussmann plant on June 5, 1977, and again on June 6, 1977, after issuing his amended restraining order. On the latter occasion, the judge personally read his amended order to the crowd, and while not present on the scene on August 1, he was aware before the trial in this case that the order had been read to the crowd on August 1. Second, the judge knew in advance of the trial that petitioners Ramsey and Stone were not employed at Hussmann Refrigerator Co. When the cases of petitioners and other defendants were called up on August 15, 1977, attorney for petitioners orally requested continuances for them and the other twenty-nine defendants he represented. Subsequently, he was granted a continuance as to 29 defendants, but his request was denied as to petitioners Ramsey and Stone. Petitioners' case proceeded to trial on August 15, 1977. Thirdly, it is alleged the trial judge formed an opinion of guilt prior to the close of all the evidence, evidenced by the fact that the Warrant and Order of Commitment as to each petitioner had been substantially prepared prior to the end of the trial.

Several considerations must guide us in passing on petitioners' claim of bias in this proceeding. As noted earlier, a criminal contempt proceeding is sui generis. While the alleged contemnor in such a pro-

---

**5.** The Findings of Fact, Conclusions of Law, and Judgment, and the Warrant and Order of Commitment, appear in a Supplemental Transcript approved by the parties and filed with

this court after petitioners' brief was filed. Petitioners did not orally argue the point before this court.

ceeding is afforded many of the protections of the criminal defendant, the criminal contempt proceeding by its nature is readily distinguishable from all other criminal matters. Cf. *State ex rel. Girard v. Percich*, 557 S.W.2d 25 (Mo.App.1977). The contempt proceeding is ancillary to the action from which the contempt arose. *Frankel v. Moskovitz*, 503 S.W.2d 428 (Mo.App.1973). It follows that the judge who issues a valid restraining order may be expected to have an interest in ensuring compliance with that order and, accordingly, will have some knowledge of the circumstances and activities which form the basis of later contempt prosecutions. Yet judges are expected to faithfully and judiciously carry out the duties of their offices. *State ex rel. Heimburger v. Wells*, 210 Mo. 601, 109 S.W. 758, 761 (1908). Judges therefore are accorded the presumption that they will not undertake to preside in matters in which they will have a personal interest or where they cannot be impartial. *Houston v. Hennessey*, 534 S.W.2d 52, 55 (Mo.App.1975). In a case of indirect contempt, where the offense occurs outside the presence of the court, and arises "out of no colloquy or encounter with the judge that would tend to arouse his passion or ill will." *Osborne v. Purdome*, 244 S.W.2d 1005, 1013 (Mo. banc 1951) *cert. den.*, 343 U.S. 953, 72 S.Ct. 1046, 96 L.Ed. 1354 (1952), evidence of bias must be the more compelling. Granted,

> . . . contemptuous conduct, though short of personal attack, may still provoke a trial judge and so embroil him in controversy that he cannot "hold the balance nice, clear, and true between the State and the accused. . . ." (Citation omitted). In making this ultimate judgment, the inquiry must be not only whether there was actual bias . . ., but also whether there was "such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." (Citation omitted).

*Taylor v. Hayes*, 418 U.S. 488, 501, 94 S.Ct. 2697, 2704, 41 L.Ed.2d 897 (1974).

We find nothing in the record of this case indicating the court could not and did not give petitioners an impartial trial or to suggest the likelihood or appearance of bias. Indeed, petitioners themselves state "the judicial temperament displayed by the judge during the trial is not at issue." The several instances of allegedly prejudicial conduct cited by petitioners are not ipso facto evidence of bias. We fail to discern possible ill effects of the judge's knowledge of surrounding circumstances and his pre-trial preparation of documents on his ability to make the essential factual determinations, to wit: whether petitioners had actual knowledge of the restraining order, and whether they willfully conducted themselves in violation of the order. The court demonstrated its readiness to enforce its lawful order and to punish those who willfully violated the order. Its efforts to stay abreast of developments in Hussmann's labor situation were not inconsistent with the duty to effectuate its restraining order. And at such time as alleged contemnors appeared in court to answer charges of contempt, it was not improper for the court to be prepared to expeditiously dispose of the numerous cases and avoid unnecessary delay and inconvenience to the parties as well as the court. There is no evidence of the court's having decided the case prior to hearing all the evidence. Petitioners' bare allegation that a competent secretary could not type the court's Findings of Fact, Conclusions of Law, and Judgment, and the Warrant and Order of Commitment, in the time which elapsed between the close of the evidence and announcement of the court's orders, and that these documents therefore must have been prepared in advance, is not evidence the court reached its decision prior to the close of the case, nor is it evidence of judicial impropriety. Much of the aforementioned documents was a mere recitation of the temporary restraining order. Certainly, it was not improper for the court to have in its possession the proposed orders, or to prepare tentative Findings of Fact as the trial proceeded. Petitioners' point is without merit.

■ They argue next that the trial court abused its discretion in denying their request for a continuance, that they did not have a reasonable time to prepare a defense, to consult with counsel, to engage in discovery, or to interview witnesses. Petitioners were arrested on August 1, 1977. They had notice of impending court proceedings against them as early as August 1; and no later than August 10, 1977, they were served with an order to show cause on August 15, 1977, why the court should not find them in contempt. Petitioner Ramsey first contacted his attorney on the eve of the August 15 hearing, and petitioner Stone met the same attorney for the first time the morning of August 15. Their request for a continuance to August 17 was denied, and petitioners' case proceeded to trial the afternoon of August 15.

■ As a result of the trial court's refusal to grant the continuance, petitioners argue, they were denied an opportunity to prepare a defense. Their defense would have consisted of testimony that officers of the Bridgeton Police Department, on occasions prior to August 1, had permitted persons to gather within 100 yards of Hussmann's fence provided they did so peacefully. At trial, petitioners' attorney did in fact attempt to elicit testimony to this effect from one witness, a union member, who was not present on August 1, but who had been permitted by police on previous occasions to remain within the 100-yard limit. The court sustained the special prosecutor's hearsay objection to this testimony. Nevertheless, three officers of the Bridgeton Police Department, including Chief of Police, George Krelo, and Lieutenant Eugene Hoff, testified on behalf of the prosecution. Presented the opportunity to examine these witnesses and elicit testimony in support of petitioners' stated defense, the attorney for petitioners pursued other lines of questioning on cross-examination and did not avail himself of the opportunity which petitioners now argue was denied them.[6]

Procedural due process in a criminal contempt proceeding "requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation."

*Mechanic v. Gruensfelder*, 461 S.W.2d 298, 309 (Mo.App.1970); Rule 35.01. There can be no question but that petitioners were advised of the charges against them and were provided notice of the impending hearing. The timing of the notice allowed petitioners ample time to seek the advice and representation of counsel, and their failure to do so until just prior to the time of the hearing cannot be deemed a denial of their right to counsel. At trial, numerous witnesses were called by both sides, and their combined testimony yielded a thorough description of the events of August 1 and petitioners' activities in particular.

■ Whether petitioners had a reasonable opportunity to meet the charges against them by way of explanation or defense is a determination to be made in the context of the circumstances of this case.[7]

---

6. We do not suggest that permission of the police to remain within the 100-yard limit would have constituted a valid legal defense in this case. *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), cited by petitioners in support of this point, is readily distinguishable from the instant case.

7. We do note that the circumstances in the case of *Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), are not dissimilar to those in the instant case. Ungar was served with a show cause order in a criminal contempt proceeding on Thursday afternoon around 5:00 p. m. A hearing was scheduled for the following Tuesday at 10·00 a. m., and Ungar appeared with counsel at the appointed time. Two short continuances were granted to allow another lawyer to enter his appearance for Ungar. When the latter arrived, the case was again called and counsel requested a one-week continuance, informing the court that he was unfamiliar with the case since he had not been contacted until the previous Saturday and was presently engaged in the trial of another case. The court denied the request for continuance for the reason that Ungar had been afforded sufficient time to hire counsel who would be available at the time of the scheduled hearing.

In passing on petitioners' request for a continuance, the trial court was forced to make its determination whether they had been allowed reasonable time to prepare for trial. The court considered the arguments of petitioners' attorney in support of their request for a continuance and was well aware of their specific circumstances. Whether to grant a continuance is largely within the discretion of the trial court, and denial of a continuance is rarely reversible error. *Blessing v. Blessing*, 539 S.W.2d 699 (Mo. App.1976). When a challenge to the trial court's denial of a continuance is made, every intendment is in favor of its ruling. *State ex rel. State Highway Com'n. v. Herman*, 546 S.W.2d 488 (Mo.App.1976). After reviewing the record, we cannot say the trial court abused its discretion in this case. Petitioners have failed to persuade us that their ability to meet the charges was diminished as a result of the court's action, or that their case would have been better served had they been granted a two-day continuance. If petitioners' attorney was placed at a disadvantage, he was disadvantaged by the inaction of petitioners and not by the action of the court. In the circumstances of this case, we think the trial judge was properly concerned with controlling the court's docket and expediting the rather cumbersome proceedings involving some 100 alleged contemnors, and therefore acted within his discretion in ordering petitioners' case to trial.

■ Finally, petitioners argue the evidence was insufficient to find, beyond a reasonable doubt, that they were guilty of criminal contempt. To repeat, the elements of criminal contempt that must be proved are actual knowledge of the restraining or-

der and willful conduct in violation of its terms. In a habeas corpus proceeding involving a challenge to the sufficiency of the evidence, we do not review the record de novo, but must determine whether the trial court's findings are supported by the evidence. *Ex Parte Neal*, 507 S.W.2d 674 (Mo. App.1974); *Mechanic v. Gruensfelder*, 461 S.W.2d 298 (Mo.App.1970). In making this determination, we view the evidence in the light most favorable to the court's judgment, giving consideration to all favorable inferences which reasonably may be drawn from the evidence. All facts and inferences to the contrary are to be disregarded. *State v. Franco*, 544 S.W.2d 533 (Mo. banc 1976). It is not our function to weigh the evidence where it is in conflict or to resolve issues of credibility; rather, we look to see whether there was substantial evidentiary support for the court's findings. *State ex rel. Girard v. Percich, supra*. Criminal contempt may be proved by circumstantial evidence so long as the facts are consistent with one another and with the hypothesis of guilt, and are inconsistent with a reasonable hypothesis of innocence. *Mechanic v. Gruensfelder, supra; Ex Parte Miles*, 406 S.W.2d 107 (Mo.App.1966).

■ We conclude there was substantial evidence to support a finding that petitioners had actual knowledge of the restraining order and that they acted willfully in violation of that order. Neither petitioner denies knowledge of the existence of the restraining order. Indeed, their own testimony discloses they both knew of the restraining order.[8] Furthermore, Ramsey admitted he helped prepare and distribute a handbill in which there appeared the statement: "[A]n injunction has been issued, forbidding

The Supreme Court stated at 590–91, 84 S.Ct. at 850:

> The five days' notice given petitioner was not a constitutionally inadequate time to hire counsel and prepare a defense to a case in which the evidence was fresh, the witnesses and the evidence readily available, the issues limited and clear cut . . .
>
> \*　\*　\*　\*　\*　\*
>
> [O]ther judges in other courts might well grant a continuance in these circumstances.

But the fact that something is arguable does not make it unconstitutional. Given the deference necessarily due a state trial judge in regard to the denial or granting of continuances, we cannot say these denials denied Ungar due process of law.

8. In *Curtis v. Tozer*, 374 S.W.2d 557, 601 (Mo. App.1964), the court stated: "The general rule is that if a defendant has knowledge of the issuance of an injunction or restraining order, he will be bound thereby as though it had actually been served."

the strikers from coming within 100 yards of the plant." Petitioners appeared to take the position, however, that mere knowledge of the restraining order does not constitute an element of criminal contempt; and that it must be shown they had actual knowledge of the specific terms of the order. In this regard, petitioners assert that while they knew of the order, they believed it applied only to striking Hussmann employees and not to non-employees such as themselves. They further deny having heard on August 1, the reading of the amended restraining order, which was directed to strikers and "all others". Petitioner Stone, though, admitted hearing amplified words to the effect, "you are in violation . .."

 Assuming petitioners are correct in their interpretation of the scienter requirement, their argument nevertheless fails. Evidence that the restraining order was read to the crowd, of which petitioners were a part, is sufficient to warrant the court's finding that they had actual knowledge of the restraining order. It is not "necessary for the prosecution to establish that in fact the petitioners read a copy of an order received by them. Nor is it necessary to establish that they listened to an order read to a gathering of which they were a part. Such proof would be very nearly impossible. But there must be some evidence of record to put the individual petitioner into a place or position where the existence of the order was called to his attention." *Mechanic v. Gruensfelder, supra* at 312. Petitioners admit their presence at and participation in the August 1 demonstration near the Hussmann premises. Moreover, several police officers assigned to the scene and standing within 20 feet of petitioners heard the order as it was read twice over the loudspeaker. The first element of the offense clearly was sustained by the evidence in the record.

With respect to the second element of contempt, willful conduct in violation of the restraining order, petitioners admit their involvement in the August 1 demonstration, but argue that their conduct was not a willful attempt to violate the order; the evidence, they claim, is insufficient to demonstrate the requisite criminal intent. Here again, petitioners seek to impose a nearly impossible burden on the prosecution. Direct evidence of criminal intent is rarely obtainable and more frequently must be inferred from the evidence of defendants' conduct. In this case, petitioners' participation in the demonstration is not controverted. The trial court could reasonably infer therefrom that petitioners engaged in the contemptuous activity knowingly and willfully in violation of its order.

Upon examination of the record, we find there was sufficient credible evidence for the court to find beyond a reasonable doubt that both petitioners were guilty of criminal contempt. Petitioners are not being illegally restrained, and we therefore order that our writs to both petitioners be quashed and that petitioners be remanded to the custody of respondent.

All the Judges concur.